## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re ) | Chapter 11 |
| ) | |
| ANDERSON NEWS, LLC, ) | Case No. 09-10695 (CSS) |
| ) | |
| Debtor. ) | Hearing Date: March 2, 2010 at 2:30 PM |
| ) | Objection Deadline: February 25, 2010 |
| ) | at 2:30 PM |
| ) | |

### DEBTOR'S MOTION FOR ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 361, 362, 363, 364 AND 507: (I) AUTHORIZING DEBTOR (A) TO OBTAIN POSTPETITION FINANCING AND (B) TO UTILIZE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING SUPER PRIORITY ADMINISTRATIVE EXPENSE STATUS; AND (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES

Anderson News, LLC (the "Debtor"), the debtor and debtor-in-possession in the

above-captioned Chapter 11 bankruptcy case (the "Bankruptcy Case"), hereby files this

motion (the "Motion") for entry of an order (the "Financing Order") under sections

105(a), 361, 362, 363, 364 and 507 of title 11 of the United States Code (the "Bankruptcy

Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and Del. Bankr. L. R. 4001-2:  (I) authorizing the Debtor (A) to

enter into a financing arrangement (as amended, modified and in effect from time to time,

the "DIP Credit Facility") as provided for in that certain credit agreement, substantially in

the form attached hereto (as amended, modified and in effect from time to time, and

together with any and all other related documents and agreements entered into in

connection with or related to the DIP Credit Facility, including, without limitation, any

fee letters, the "DIP Credit Agreement"), and (B) to use Cash Collateral, as defined in

section 363(a) of the Bankruptcy Code ("Cash Collateral"), (II) granting liens and

providing super priority administrative expense status, and (III) granting "adequate protection" to the Prepetition Lender (as defined below). In support of the Motion, the Debtor, by and through its undersigned proposed counsel, respectfully represents as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief set forth herein are sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code.

## BACKGROUND

A.     **Introduction.**

2.     On March 2, 2009, certain petitioning creditors filed an involuntary petition (the "Involuntary Petition") against the Debtor. Following a two-day hearing on the Debtor's motion to dismiss the involuntary petition, the Court, on December 30, 2009 (the "Relief Date"), denied dismissal [Docket No. 188], entered an Order for Relief under Chapter 7 [Docket No. 189] and converted the Bankruptcy Case to a case under Chapter 11 [Docket No. 190].

3.     The Debtor continues to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or official committee of unsecured creditors has been appointed in the Bankruptcy Case.

2

B.    **Overview of the Debtor's Business.**

4.    The Debtor was founded in 1917.  Prior to February 2009, it, together with its non-debtor affiliate Anderson Services, LLC ("Anderson Services"), was the second largest wholesaler of books and magazines in the United States.  The Debtor and Anderson Services together serviced 30,000 retail customers in 37 states.  They had 1,991 employees and annual revenues (in 2008) on a standalone basis of $873,461,571.00.

5.    The Debtor and Anderson Services each served a different function in the overall business operation.  The Debtor was primarily responsible for sales and for marketing services.  Anderson Services' role focused on logistics such as warehousing, delivery and merchandising.  Based upon events described further below, the Debtor ceased day-to-day operations and is winding up its business and administering its assets.

6.    The Anderson family of companies is private and family owned, and is based in Knoxville, Tennessee.  Collectively, the Anderson family of companies is one of the largest wholesaler and distributor of books, magazines, movies, and other media in the United States.

C.    **The Debtor's Debts.**

7.    On or about September 30, 2004, the Debtor entered into a Revolving Credit Loan Agreement with SunTrust Bank (the "Prepetition Loan"), as administrative agent for the lenders thereunder, pursuant to which the Debtor borrowed funds secured by first priority liens in substantially all of the Debtor's assets including, without limitation, the Debtor's cash collateral (the "Prepetition Collateral").  The Prepetition Collateral does not include the Debtor's interests in litigations and causes of action such as the Antitrust Action (as defined below) or proceeds thereto.  On April 28, 2009, Holston Asset Management L.L.C. ("Holston") purchased the SunTrust Bank loan at its then face

3

outstanding amount of $30,515,892.00. Accordingly, Holston is the current holder of the SunTrust Bank loan as well as the security interests granted pursuant to the SunTrust Bank loan. Holston, solely in its capacity as lender under the Prepetition Loan, is referred to herein as the "Prepetition Lender."

8.      In the ordinary course of its business, the Debtor incurred substantial unsecured obligations owed on an unsecured basis to various creditors and potential creditors. These creditors fall into three broad categories: (i) magazine publishers, (ii) book publishers, and (iii) other creditors including SG&A (selling general and administrative expenses) and retail sellers of books and magazines.

**D.      Events Leading to the Debtor's Cessation of Business.**

9.      The magazine wholesale business (but not the book distribution business) has, for a number of years, presented a situation where the major national magazine publishers have forced the Debtor to accept many more magazines than would ever be sold. The economic burden of these practices was borne principally by wholesalers, such as the Debtor, and by retailers, in that they would be required, among other things, to purchase magazines from the publishers that would never be sold and would have to carry the accompanying inventory until it was later returned to the publishers, increasing the cost for the wholesaler.

10.      In January 2009, the Debtor announced that it would continue to purchase the excess magazines from publishers, but would also impose a seven cent per copy charge for all magazines that it purchased at wholesale from the magazine publishers. Certain publishers, acting in concert, ceased doing business with the Debtor and instead allocated all magazine sales through the two other national magazine wholesalers, Hudson News Distributors, LLC and The News Group, LP.

4

11.     Indeed, the publishers and national distributors who comprised the
conspiracy sought to drive out of business the Debtor's competitor Source Interlink
Distribution, L.L.C. ("Source"), which also advocated measures to transfer all or part of
the increased costs of magazine distribution to the publishers.  In early February 2009,
Source, represented by the law firm of Kasowitz, Benson, Torres & Friedman LLP
("KBT&F") (the Debtor's proposed counsel in this Bankruptcy Case) commenced an
action in the United States District Court for the Southern District of New York (*Source
Interlink Distribution, L.L.C., et al., v. Am. Media, Inc., et al.*, No. 09 Civ. 1152 (PAC))
against the publishers and national distributors, seeking preliminary and permanent
injunctive relief as well as damages.  The court granted a temporary restraining order
requiring the defendants to continue supplying magazines to Source.  Source
subsequently settled with all but two of the defendants, which were voluntarily dismissed
from the action.

12.     In view of the publishers' and national distributors' uniform rejection of
the charge proposed by the Debtor, the Debtor was compelled on February 7, 2009 to
cease conducting business.  Thereafter, the Debtor began a voluntary, out-of-court
liquidation of its business.

E.     **The Antitrust Litigation.**

13.     On March 10, 2009, the Debtor and Anderson Services commenced an
action in the United States District Court for the Southern District of New York (the
"Antitrust Action") against, among others, certain magazine publishers (the "Antitrust
Defendants").  In their complaint (the "Antitrust Complaint"), the Debtor and Anderson
Services allege that the Antitrust Defendants conspired to deny the Debtor the magazines
it needed to fulfill its obligations to retailers.  The Antitrust Complaint further alleges that

5

the goal of the conspiracy, which was effectuated through meetings and other communications, was to drive the Debtor and Source out of business. The Antitrust Complaint further alleges that by eliminating the Debtor and Source from the wholesale magazine distribution market, the Antitrust Defendants sought to reverse a growing trend among retailers to implement an efficient scan-based trading system, as well as efforts by the Debtor to force the publishers and distributors to share the enormously burdensome costs of the inefficient distribution system that the publishers and distributors had created.

14. To assist with the liquidation, on February 16, 2009, the Debtor and Anderson Services each retained Newleaf Corporation ("Newleaf") which, through its principal, Lloyd Whitaker, regularly acts as a liquidating trustee or agent for financially-troubled companies. Upon Newleaf's engagement, it began the process of collecting and liquidating the Debtor's inventory and other assets, determining claims against other entities, and otherwise attempting to coordinate and communicate with the many counterparties (as well as the thousands of former employees) that asserted interests in the Debtor's liquidation.[1]

15. Following the Petition Date, but before the Relief Date (the "Gap Period"), the Debtor along with Northshore Capital Management, LLC ("Northshore") and Holston, engaged in extensive negotiations with the Debtor's creditors, pursuant to which Northshore offered to purchase, for a reduced price, each undisputed claim asserted by a book publisher, magazine publisher or retail customer. Through that process, Northshore purchased approximately $52,000,000 face amount of claims, which

---

[1] On April 30, 2009, Anderson Services commenced an Assignment for the Benefit of Creditors in the Court of Chancery for Knox County, Tennessee, appointing Mr. Whitaker as assignee for Anderson Services, and assigning all of Anderson Services' interests in the Antitrust Action to Mr. Whitaker.

B02:9216650.1

068206.1001

the Debtor estimates – based on its books and records – accounts for approximately 80% of its undisputed general unsecured claims.

## **RELIEF REQUESTED**

16. By this Motion, the Debtor seeks entry of the Financing Order, <u>inter alia</u>:

(a) under sections 364(c) and (e) of the Bankruptcy Code, authorizing the Debtor to obtain postpetition financing consisting of a revolving credit facility from Holston (solely in its capacity as lender under the DIP Credit Agreement, the "DIP Lender"), with funds thereunder available for use in accordance with the budget (as amended, modified or updated in accordance with the DIP Credit Agreement, the "DIP Budget") and the other terms set forth in the DIP Credit Agreement;

(b) under section 364(c)(1) of the Bankruptcy Code, and subject to the Carve-Out (as defined below) and certain administrative claims, granting super priority claim status to the claims of the DIP Lender under the DIP Credit Agreement;

(c) under sections 364(c)(2), and (c)(3) of the Bankruptcy Code, as security for the repayment of the borrowings and all other obligations arising under the DIP Credit Agreement, authorizing the Debtor to grant to the DIP Lender security interests in and liens upon the Collateral, subject to the Carve-Out (each as defined in the Financing Order) and Permitted Liens;

(d) under sections 361, 363(c)(2), 363(c)(3), and 363(e) of the Bankruptcy Code, authorizing the Debtor to use the Prepetition Collateral (as defined below), including the Cash Collateral, and to provide certain protections with respect to any diminution in the value of the Prepetition Lender's interest in the Prepetition Collateral resulting from the use, sale or lease of the Prepetition Collateral or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code;

(e) under sections 363 and 364 of the Bankruptcy Code, authorizing the Debtor to use the proceeds of the DIP Credit Facility for, among other things, working capital and general corporate purposes, payment of costs of administration of the Bankruptcy Case, as contemplated in the DIP Credit Agreement and as approved by the Court; and

B02:9216650.1                                                                 068206.1001

(f)    under section 362 of the Bankruptcy Code, modifying the automatic stay to the extent set forth in the DIP Credit Agreement;

## BASIS FOR RELIEF

**F.    The Debtor's Need for Liquidity.**

17.    As discussed above, the Debtor ceased all operations other than the liquidation of accounts receivable and claims pursuit and reconciliation. Its only current source of internally-generated cash is collection of accounts receivable.

18.    The Debtor's primary payment obligations are professional fees required to administer its Bankruptcy Case and to prosecute the Antitrust Action. The Debtor firmly believes that the Antitrust Action is its most valuable asset, and that funding that lawsuit is critical for a recovery to its stakeholders.

19.    As the Debtor's collections from accounts receivable are insufficient to pay its obligations – even with cash collateral authority – it requires debtor-in-possession financing. At this time the Debtor anticipates requiring between $7,500,000 and $10,000,000 to administer its Bankruptcy Case, pay all post-petition ordinary course obligations, and to prosecute the Antitrust Action.

**G.    The Debtor's Decision to Enter Into the DIP Credit Agreement.**

20.    After the Relief Date, the Debtor began a search for parties willing to provide financing to the Debtor. In addition to Holston, the Debtor and its representatives have begun the process and will attempt to have discussions with several entities regarding various alternative financing sources prior to the Hearing on the Motion.

21.    On January 6, 2010, counsel for the Debtor received Holston's initial term sheet, in draft form, setting forth proposed financing terms.

8

22.     The Debtor and Holston, through their respective counsel, engaged in several rounds of negotiations regarding financing terms. Those negotiations and discussions primarily took the form of responsive revisions to the term sheet, the proposed Financing Order, and the DIP Credit Agreement. While the terms offered by Holston and described herein are the most favorable financing terms the Debtor has been able to find to date, the Debtor reserves the right to not enter into the DIP Credit Agreement if it is later able to find financing on more favorable terms than those offered by Holston in the DIP Credit Agreement.

23.     Ultimately, the Debtor and Holston agreed, subject to Court approval, to the following terms for the DIP Facility and the Debtor's use of cash collateral:

**H.      Terms of the DIP Credit Agreement / Cash Collateral Use.**

24.     The principal terms of the DIP Credit Agreement are as follows[2]:

| | |
|---|---|
| **Borrower:** | Anderson News, LLC, a Delaware limited liability company (alternatively, the Debtor or, for purposes of the DIP Credit Facility, the "Borrower"). |
| **Lender:** | Holston Asset Management L.L.C., a Delaware limited liability company. |
| **Type and Maturity:** | DIP Credit Facility (alternatively, the "Loan") will be a revolving line of credit loan that matures upon the earlier of (a) thirty (30) months following the date that an order is entered in the Chapter 11 Case approving the DIP Credit Facility on terms acceptable to the DIP Lender, (b) the effective date of a Chapter 11 plan, or (c) default and acceleration of the Loan. |
| **Amount:** | The initial amount of the DIP Credit Facility shall be up to $7,500,000. At Borrowers' request, upon agreement of DIP Lender, the amount of the DIP Credit Facility may be increased by such additional amounts as the parties may agree up to an aggregate principal of $10,000,000.00. |

---

[2]     Capitalized terms used but not defined this summary of the DIP Credit Agreement shall have the meanings assigned to them in the DIP Credit Agreement.

**Collateral:** Subject to the Carve-Out (as defined below) and Permitted Liens, the DIP Credit Facility shall be secured by (a) a valid, enforceable, perfected and unavoidable first priority lien on all of Borrower's assets, including all of Borrower's rights, title, and interest in the Antitrust Action and all proceeds thereof, whether by collection after judgment or otherwise by settlement or any other means, and (b) a valid, enforceable, perfected and unavoidable junior lien on the Prepetition Collateral; provided, however, that the DIP Credit Facility Collateral excludes all causes of action that the Debtor or its bankruptcy estate may assert under sections 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code.

**Professional Fee Carve-Out:** Upon the occurrence and during the continuance of an Event of Default (as defined below), or an event that would constitute an Event of Default with the giving of notice or lapse of time or both (a "Default"), (i) the payment of allowed and unpaid professional fees and disbursements in an aggregate amount not in excess of $750,000 incurred by the Debtor, of which amount, in the event any Statutory Committee is appointed, $100,000 may be used for the payment of allowed and unpaid professional fees and disbursements of such Statutory Committee, (a) if incurred prior to the occurrence of such Default or Event of Default, then pursuant to the Budget, or (b) if incurred following the occurrence of such Default or Event of Default, then (x) for the duration that a Budget exists, pursuant to the Budget, and (y) thereafter, all amounts incurred, (ii) following a conversion to Chapter 7, the payment of the trustee's professional fees not to exceed $25,000, and (iii) the payment of fees pursuant to 28 U.S.C. §1930 prior to the occurrence of such Default or Event of Default ((i), (ii), and (iii) together, the "Carve-Out").

**Use of Loans:** Proceeds of the Loan are to be used pursuant to a budget[3] to be agreed upon by the DIP Lender and the Borrower to finance the administration of the Chapter 11 Case, including, without limitation, the pursuit and prosecution of the Antitrust Action. Budgets shall be agreed upon by the DIP Lender and Borrower at least quarterly. Only budgeted expenses, subject to a 10.0% variance per quarter on an aggregate basis (and thus not by line item), will be

---

[3] The Budget will be filed with the Court prior to the Hearing on this Motion.

funded from the Loan proceeds, unless the DIP Lender otherwise consents. Advances from DIP Lender to pay approved budget expenses will be made within two business days of draw request with supporting documentation. Draw requests are not to be made more than once per calendar month.

**Reimbursement of Lender Expenses:** Proceeds of the Loan shall also be used for (i) the reimbursement of any and all costs incurred by Lender in connection with the transaction contemplated by the DIP Loan Documents, including, without limitation, all reasonable fees and expenses of Professionals retained by Lender in analysis, negotiation or administration of any aspect of such transaction, including further, without limitation, the negotiation and drafting of the DIP Loan Documents (or any amendments thereto), and (ii) the costs and expenses required to preserve, perfect, protect and enforce Lender's rights under the Approval Order or under the DIP Loan Documents, or to collect the Obligations, including, without limitation, all filing and recording fees and fees and expenses of any Professionals incurred by Lender in connection with any of the foregoing.

**Mandatory Advances:** Lender shall be obligated to make certain Advances (the "Mandatory Advances") in the amounts set forth in the Carve-Out within two days of a written request made by Borrower's Representative, provided however, that, in no event shall such Mandatory Advance or Mandatory Advances cause the Revolving Loan to exceed the Credit Amount and such Mandatory Advance or Mandatory Advances shall be automatically reduced so as not to cause the Loan to exceed the Credit Amount.

**Limitations on Use:** The proceeds from the Loan and the Carve-Out may not be used to prosecute or otherwise pursue any claims of Borrower against DIP Lender or its affiliates, provided however, that (a) the Borrower and any Statutory Committee or examiner may prosecute or pursue any claims of Borrower against DIP Lender arising out of or in respect of the Loan or the related finance documents and (b) any Statutory Committee or examiner may use up to $50,000.00 to fund the investigation of claims the Borrower may have against DIP Lender, and (c) any Statutory Committee or examiner may use up to $100,000.00 to fund the investigation of claims the Borrower may have against

|  | any affiliate of DIP Lender up to an amount of $100,000.00. |
|---|---|
| **Interest Rate:** | The interest rate shall be the LIBOR Rate plus [1200 bps], calculated on a 360/actual basis. |
|  | Interest shall accrue, and absent an Event of Default (as defined below), be due and payable, at Borrower's option (i) in cash on the first business day of each month, or (ii) at the maturity of the Loan. The default rate shall be four percent (4.00%) over and above the non-default rate. |
| **Expense Reimbursement:** | Borrower shall reimburse the DIP Lender for expenses (including the reasonable fees and expenses of DIP Lender's attorneys) incurred by DIP Lender arising out of the negotiation and administration of the Loan, and any incurred from and after the occurrence of an Event of Default (as defined below). The DIP Lender shall be authorized to disburse loan proceeds under the Loan in direct payment or reimbursement of such costs and expenses. |
| **Prepayments:** | Voluntary prepayments under the Loan may be made without premium or penalty. Prepayments shall be made at such time as collateral representing proceeds of the Antitrust Action is realized on, which prepayments shall be from the cash collateral represented by such proceeds. Proceeds of other collateral shall remain cash collateral subject to the terms of any order authorizing their use, and subject to any existing senior lien. |
| **Representations and Warranties:** | Customary and appropriate for financings of this type and for this transaction in particular. |
| **Deadline for Pursuit of Claims:** | Claims of any kind, including under Chapter 5 of Title 11, must be brought by a party in interest including a Statutory Committee by the earlier of: (a) 120 days from the entry of the Financing Order or (b) August 1, 2010 (the "Challenge Period"). |
| **Covenants:** | Customary and appropriate affirmative and negative covenants for financings of this type and for this transaction in particular. These include, without limitation, |

364(c) priorities and waiver of any right to seek any other senior loan or financing from any other lender under section 364. Specifically, in addition to the liens and security interests to be granted, and subject to the Carve-Out, the Loan shall have priority pursuant to the provisions of sections 364(c)(1) and 507(b) of the Bankruptcy Code, over all administrative and priority expenses incurred in the Chapter 11 Case, including, without limitation, expenses of the kind specified in section 503(b), 507(a) and 507(b) of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtor, its creditors other than the DIP Lender, or the successors in interest of the Debtor or its creditors, including without limitation any trustee appointed in the Chapter 11 Case, and any trustee in a case under chapter 7 of the Bankruptcy Code into which the Chapter 11 Case may be converted. No other loan may be authorized by the Court with a lien in any assets that secure the Loan that is senior to the Loan, and any other loan shall have a priority under section 364(c)(1) junior to that of the Loan.

**Events of Default:**   Customary and appropriate for financings of this type and for this transaction in particular, including, without limitation, the appointment of a trustee in the Chapter 11 Case or a conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code (an "Event of Default").

**506(c) Waiver:**   Waiver of any and all rights to surcharge the Cash Collateral pursuant to section 506(c) of the Bankruptcy Code.

**Remedies:**   Customary and appropriate for financings of this type and for this transaction in particular.

**Indemnification:**   The Borrower shall indemnify the DIP Lender from and against any and all losses, claims, damages, liabilities, deficiencies, judgments or expenses incurred by the DIP Lender arising out of or by result of the Loan, the commitments thereunder, the use of the proceeds of the Loan or any related transaction, or any litigation, investigation, claim or proceeding, pending or threatened (whether or not any indemnified person is a party thereto), that arise out of or are in any way based upon any of the foregoing, including without limitation, amounts paid in settlement, court costs and the fees and disbursements of counsel incurred in connection with any such litigation, investigation, claim or proceedings; provided, however,

that the foregoing indemnity obligations shall not apply (i) to any such losses, claims, damages, liabilities, deficiencies, judgments or expenses which, as determined by a final, non-appealable judgment of a court of competent jurisdiction, resulting from the gross negligence or willful misconduct of the DIP Lender or (ii) with respect to any claims against or costs of Lender arising from investigations of Lender or Lender's Affiliates by any Committee or examiner.

**Governing Law:** The Loan Documents shall be governed by and construed in accordance with the substantive laws of the State of Delaware, without regard to principles of conflicts of laws.

## I. Provisions that Potentially Implicate Local Rule 4001-2.

25. Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") requires that certain provisions contained in the DIP Credit Agreement be highlighted, and that the Debtor provide justification for the inclusion of such highlighted provision(s).

26. Local Rule 4001-2(a)(i) provides:

Provisions to be Highlighted. All Financing Motions must (a) recite whether the proposed form of order and/or underlying cash collateral stipulation or loan agreement contains any provision of the type indicated below, (b) identify the location of any such provision in the proposed form of order, cash collateral stipulation and/or loan agreement and (c) justify the inclusion of such provision:

(A) Provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors (i.e., clauses that secure prepetition debt by postpetition assets in which the secured creditor would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law);

(B) Provisions or findings of fact that bind the

B02:9216650.1                                    068206.1001

estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate such matters;

(C)     Provisions that seek to waive, without notice, whatever rights the estate may have under 11 U.S.C. § 506(c);

(D)     Provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548 and 549;

(E)     Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b);

(F)     Provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out; and

(G)     Provisions that prime any secured lien without the consent of that lienor.

**(i)     Local Rule 4001-2(a)(i)(A)**

27.     Local Rule 4001(2)(a)(i)(A), dealing with cross-collateralization provisions, is not implicated by the Financing Order.

**(ii)     Local Rule 4001-2(a)(i)(B)**

28.     Local Rule 4001-2(a)(i)(B) requires a movant to identify provisions that bind the estates or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least 75 days from the entry of the order and the creditors' committee, if formed, at least 60 days from the date of its formation to investigate such matters.  <u>See</u> Del. Bankr. L.R. 4001- 2(a)(i)(B).

29.     Because this provision in the Financing Order affords parties in interest the requisite investigation period, the Debtor respectfully submits that it complies with the Local Rules.

**(iii)     Local Rule 4001-2(a)(i)(C)**

30.     Local Rule 4001-2(a)(i)(C) requires explicit disclosure of provisions that constitute a waiver, without notice, of the estate's rights under section 506(c) of the Bankruptcy Code.  The Financing Order provides for a waiver of the Debtor's rights vis a vis the Prepetition Lender under section 506(c) of the Bankruptcy Code only after notice and a hearing.  Thus, the Financing Order complies with Local Rule 4001-2(a)(i)(C).

**(iv)     Local Rule 4001-2(a)(i)(D)**

31.     Local Rule 4001-2(a)(i)(D) requires disclosure of provisions under which the Debtor grants liens on the Debtor's claims or causes of action under 11 U.S.C. §§ 544, 545, 547, 548 and 549.  None are granted pursuant to the Financing Order.  Thus, the Financing Order complies with Local Rule 4001-2(a)(i)(D).

**(v)     Local Rule 4001-2(a)(i)(E)**

32.     Local Rule 4001-2(a)(i)(E) requires a description of provisions which contemplate the use of postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt.  See Del. Bankr. L. R. 4001-2(a)(i)(E).  The Prepetition Loan will not be repaid from proceeds of the DIP Credit Facility.  Thus, the Financing Order complies with Local Rule 4001-2(a)(i)(E).

**(vi)     Local Rule 4001-2(a)(i)(G)**

33.     Pursuant to Local Rule 4001-2(a)(i)(G), a movant must describe provisions of the proposed debtor in possession facility which contemplate a priming of any secured lien without the consent of that lienor.  See Del. Bankr. L.R. 4001-2(a)(i)(G).

16

No priming is contemplated.  Thus, the Financing Order complies with Local Rule 4001-2(a)(i)(G).

* * *

34.     As set forth above, the Debtor will continue to seek financing on terms more favorable from sources other than Holston.  The Debtor has an immediate need to obtain financing and use the Prepetition Collateral in order to ensure, <u>inter alia</u>, that the Debtor has sufficient working capital and liquidity to liquidate its assets and pursue the Antitrust Action.  Accordingly, the Debtor respectfully submits that the aforementioned circumstances demonstrate that the above-described provisions are necessary and appropriate and should be authorized and approved by this Court.  Moreover, the Debtor reserves the right to seek alternative forms of financing on even more favorable terms prior to the hearing on this Motion which it will disclose prior to the objection deadlines therefor.

**APPLICABLE AUTHORITY**

35.     Section 364(c) of the Bankruptcy Code provides:

> If the [debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —
>
> (1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3)     secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

17

36.     Section 364(d)(1) of the Bankruptcy Code provides:

> The court, after notice and a hearing, may authorize the obtaining of
> credit or the incurring of debt secured by a senior or equal lien on
> property of the estate that is subject to a lien only if
>
> (A) the [debtor in possession] is unable to obtain such credit otherwise;
> and
> (B) there is adequate protection of the interest of the holder of
> the lien on the property of the estate on which such senior or
> equal lien is proposed to be granted.

11 U.S.C. § 364(d).

37.     Bankruptcy Rule 4001(c)(2) provides, in relevant part:

> The court may commence a final hearing on a motion for
> authority to obtain credit no earlier than 14 days after service of
> the motion. If the motion so requests, the court may conduct a
> hearing before such 14 day period expires, but the court may
> authorize the obtaining of credit only to the extent necessary to
> avoid immediate and irreparable harm to the estate pending a
> final hearing.

Fed. R. Bankr. P. 4001(c)(2).

## DIP FINANCING

38.     As previously mentioned, to date, the Debtor has not obtained postpetition

financing on an unsecured basis or on a basis junior to the Prepetition Loan in an amount,

and within the timeframe, that the Debtor's current liquidity situation mandates.

39.     The Debtor extensively negotiated the DIP Credit Agreement and its terms

and has determined, in the exercise of its business judgment, that it is the best proposal

under the circumstances. Inasmuch as Holston is an affiliate of the Debtor, extra

measures were undertaken to ensure fair and full negotiations took place including by

having the bulk of business terms negotiated by counsel for Holston and proposed

counsel for the Debtor. Provided that this judgment does not run afoul of the provisions

of and policies underlying, the Bankruptcy Code, courts grant debtors considerable

deference in acting in accordance with its business judgment.  See, e.g., In re Ames Dept. Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (courts have discretion under Bankruptcy Code § 364 to permit debtors to exercise reasonable business judgment so long as (i) the terms of the financing agreement do not "leverage the bankruptcy process and powers" and (ii) the financing agreement's purpose is primarily to benefit the estate, and not a party in interest).  The financing under the DIP Credit Facility provides additional liquidity to the Debtor sufficient to enable it, inter alia, to (a) minimize disruption to its business, (b) preserve and maximize the value of its estates for the benefit of all creditors, and (c) avoid immediate and irreparable harm to its business, creditors and employees, and its assets.  Without the financing provided for in the DIP Credit Agreement, the Debtor will not be able to meet its direct obligations and will suffer irreparable harm.

40.    The Debtor believes that the terms and conditions of the DIP Credit Agreement are fair and reasonable under the circumstances.  Accordingly, the Debtor requests that the DIP Lender be afforded the benefits of section 364(e) of the Bankruptcy Code in respect of the DIP Credit Agreement.

41.    Based upon the foregoing, the Debtor respectfully requests that the Court approve the DIP Credit Facility in accordance with the terms set forth in the Financing Order and the DIP Credit Agreement or some other more favorable financing agreement to be submitted prior to the Hearing.

## CASH COLLATERAL

42.    In addition to the need for debtor in possession financing, the Debtor requires immediate use of the Cash Collateral pending a hearing on this Motion.  The

Debtor requires use of Cash Collateral to be able to pay expenses, including payroll, and to pay certain vendors and professionals.

43. Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell, or lease cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). The Prepetition Lender has consented to the Debtor's use of Cash Collateral on the terms and conditions set forth in the Financing Order.

44. Based upon the foregoing, the Debtor respectfully requests that the Court authorize the Debtor to use the Cash Collateral in accordance with the terms set forth in the Financing Order and the DIP Credit Agreement.

## ADEQUATE PROTECTION

45. In exchange for the Debtor's use of the Prepetition Collateral, the Debtor has agreed to provide certain adequate protection to the Prepetition Lender. The Debtor and the Prepetition Lender have negotiated, and the Debtor requests that the Court approve, certain protections of the Prepetition Lender's interests in the Prepetition Collateral from any diminution in value, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

46. Such protections include, among other things, granting to the Prepetition Lender Adequate Protection Liens and the Prepetition Superpriority Claim (both as defined below) in respect of the adequate protection obligations. Specifically, the Financing Order grants Prepetition Lender the following:

B02:9216650.1                                                                 068206.1001

(a) <u>Adequate Protection Liens</u>:  Pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Lender in the Prepetition Collateral, if any, for any diminution in the value of each of its interests in the Prepetition Collateral (including Cash Collateral) for any reason resulting from: (a) the Debtor's use, sale or lease of such collateral; (b) the imposition of the automatic stay; and (c) the subordination to the Carve-Out (collectively, and solely to the extent of any such diminution in value, the "<u>Diminution in Value</u>"), the Debtor is authorized to grant to the Prepetition Lender continuing valid, binding, enforceable and perfected postpetition security interests in and liens on the DIP Collateral (the "<u>Adequate Protection Liens</u>"). The Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the DIP Collateral, except that the Adequate Protection Liens shall be junior to (A) the Permitted Prior Liens, (B) the Carve-Out, and (C) the DIP Liens on the DIP Priority Collateral.  Except as provided herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter in the Bankruptcy Case or any Successor Case (as defined herein), and shall be valid and enforceable against any trustee appointed in any of the Bankruptcy Case or any Successor Case (as defined herein), or upon the dismissal of any of the Bankruptcy Case or Successor Case (as defined herein).  The Adequate Protection Liens shall not be subject to Bankruptcy Code sections 510 (except to the extent of Prepetition Liens), 549, or 550.  No lien or interest avoided and preserved for the benefit of the estate pursuant to Bankruptcy Code section 551 shall be *pari passu* with or senior to the Prepetition Liens or the Adequate Protection Liens.

B02:9216650.1                                                                                                          068206.1001

(b) Prepetition Lender Superpriority Claim: As further adequate protection of the interests of the Prepetition Lender in the Prepetition Collateral, if any, against any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Lender is granted as and to the extent provided by section 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in the Bankruptcy Case and any Successor Case (as defined herein) (the "Prepetition Lender Superpriority Claim"); provided, however, that the Prepetition Lender Superpriority Claim shall not attach to any Excluded Avoidance Recoveries. Except as set forth herein, the Prepetition Lender Superpriority Claim shall have priority over all administrative expense claims and unsecured claims against the Debtor or its estate, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114; provided, however, that the Prepetition Lender Superpriority Claim shall be junior to the DIP Superpriority Claims and the Carve-Out.

47. The proposed adequate protection is intended to protect the Prepetition Lender from diminution in the value of its interest in the Prepetition Collateral during the period it is used by the Debtor. See, e.g. In re Kain, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986). The Debtor believes that the proposed adequate protection is fair and reasonable and in accord with section 361 of the Bankruptcy Code.

48. The Prepetition Lender has agreed that the adequate protection described above is sufficient to allow the Debtor to use the Cash Collateral. Based upon the

B02:9216650.1

068206.1001

foregoing, the Debtor respectfully requests that the Court authorize the Debtor to access the Prepetition Collateral, including, without limitation, the Cash Collateral, and to provide adequate protection in accordance with the terms set forth in the Financing Order and the DIP Credit Agreement.

## MODIFICATION OF THE AUTOMATIC STAY

49.     Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition. The proposed DIP Credit Facility contemplates the modification of the automatic stay (to the extent applicable), by permitting the DIP Lender to the entry of an order granting relief from the automatic stay, upon an Event of Default, to (1) to terminate, reduce or restrict the ability of the Debtor to use any Cash Collateral derived solely from the proceeds of DIP Collateral (as defined below); or (2) to pursue any and all remedies to which it may be entitled, including the right to demand and obtain immediate possession, custody, dominion and control of the DIP Collateral (as defined below), or any portion thereof, and to liquidate the same in the manner provided by applicable law.

50.     Stay modification provisions of this type are standard features of postpetition debtor in possession financing facilities and, in the Debtor's business judgment, are reasonable under the present circumstances. Accordingly, the Debtor respectfully requests that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Financing Order and DIP Credit Agreement.

## NOTICE PROCEDURES AND HEARING

51.     Notice of this Motion will be given to all parties that have requested notice in these cases, including: (i) the United States Trustee for the District of Delaware; (ii) counsel to the proposed DIP Lender; (iii) counsel to the Prepetition Lender; (iv) the

parties included on the Debtor's list of twenty (20) largest unsecured creditors; (v) any known holders of prepetition liens and (vi) any creditors that have requested notice in these cases. The Debtor submits that, under the circumstances, no further notice of the hearing on the financing is necessary and request that any further notice be dispensed with and waived.

52. No previous request for the relief sought herein has been made to this Court or any other court.

B02:9216650.1                                                                                           068206.1001

## CONCLUSION

WHEREFORE the Debtor respectfully requests that the Court (i) enter an order

substantially in the form of the proposed Financing Order and (ii) grant the Debtor such

other and further relief deemed just and proper.

Dated: Wilmington, Delaware        Respectfully submitted,
        February 1, 2010

                         YOUNG CONAWAY STARGATT & TAYLOR, LLP

                         John D. McLaughlin, Jr. (No. 4123)
                         The Brandywine Building
                         1000 West Street, 17th Floor
                         P.O. Box 391
                         Wilmington, Delaware 19899-0391
                         Telephone: (302) 571-6634
                         Facsimile: (302) 576-3316
                         jmclaughlin@ycst.com


                                  -and-

                         KASOWITZ, BENSON, TORRES
                         & FRIEDMAN LLP
                         David M. Friedman
                         Adam L. Shiff
                         Jeffrey R. Gleit
                         Daniel A. Fliman
                         1633 Broadway
                         New York, NY 10019
                         Telephone: (212) 506-1700
                         Facsimile: (212) 506-1800

                         *Proposed Counsel to Debtor in Possession*

B02:9216650.1                                                           068206.1001