IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ANDERSON NEWS, LLC, | ) | Case No. 09-10695 (CSS) |
| | ) | |
| Debtor. | ) | **Hearing Date: August 17, 2011 at 11:00 a.m.** |
| | ) | **Objection Deadline: August 10, 2011 at 4:00 p.m.** |
| | ) | |
| | ) | |
| | ) | |

## MOTION OF CERTAIN MAGAZINE CREDITORS FOR ORDER GRANTING STANDING AND AUTHORITY TO PROSECUTE AVOIDANCE AND OTHER ACTIONS ON ESTATE'S BEHALF

American Media, Inc. Bauer Magazine L.P., Bauer Publishing Company, L.P., Heinrich

Bauer North America, Inc., Heinrich Bauer Publishing, L.P., Curtis Circulation Company, LLC,

Kable Distribution Services, Inc., and Time/Warner Retail Sales & Marketing, Inc. (collectively,

"Movants"), hereby file this motion (the "Motion") for entry of an order granting to them,

collectively, standing and authority to prosecute certain avoidance and other actions on behalf of

Anderson News, LLC (the "Debtor") and its estate. In support of the Motion, Movants represent

as follows:

### PRELIMINARY STATEMENT

1.     The Examiner appointed by the Court identified in a 600-plus-page report (the

"Examiner's Report")[1] a myriad of potential claims against affiliates of the Debtor (collectively,

"Insiders"). More specifically, in the "Summary of Conclusions" the Examiner identified claims

against Insiders that total more than $69 million.[2] The Examiner acknowledged that substantial

additional claims may exist, many of which he was unable to consider because of insufficient

---

[1]      Report of Don A. Beskrone, Esq., Examiner, dated May 12, 2011, Docket No. 852.

[2]      Id., Part I, at 9-11 ("Summary of Conclusions").

documentation and other factors that caused an inability to investigate these claims to a conclusion.

2.     The Debtor has obvious conflicts of interest that make it unreasonable to expect that the Debtor will assert—let alone vigorously prosecute—causes of action against the Insiders for the benefit of the Estate.   First, the Debtor is wholly owned by Brookvale National Distributors, LLC, one of the potential defendants identified by the Examiner.   Moreover, the sole members of the Debtor's management committee (the equivalent of a board of directors) are two Anderson family members, both of whom have senior executive positions with other potential defendants, and are members of the founding family that still controls the entire, privately held Anderson Media family of companies.   Further, the Debtor has no employees. Instead, employees of Anderson Management Services, Inc.—another potential defendant—conduct the Debtor's business.

3.     In light of these obvious conflicts, the Debtor will not assert and vigorously prosecute causes of action against the Insiders for the benefit of the estate.   To the contrary, the Debtor has commenced a scheme to delay prosecution of the claims belonging to the estate. Accordingly, to protect the estate's right to tens of millions of dollars in likely recoveries, the Court should appoint an estate representative to do so.   Otherwise, the whole purpose of the lengthy and expensive Examiner process will be undermined.

4.     There is no Creditors Committee in this case.   Therefore, if the Claims are to be prosecuted by anyone, it falls on the Movants, the largest stakeholders in the case, to do so.   In the aggregate, Movants hold approximately $149 million in unsecured claims.   By this Motion, Movants collectively seek derivative standing to investigate further and, as appropriate, to

2

prosecute the claims identified by the Examiner (and potentially other claims, as set forth below), on behalf of the estate.

5.     Movants have engaged the firms of Valle Makoff LLP ("Valle Makoff") and Potter Anderson & Corroon LLP ("Potter Anderson") to prosecute these derivative claims on behalf of the estate, on a contingency fee basis. In addition, the Movants have agreed to advance significant out-of-pocket litigation expenses, including potentially large expert witness and e-discovery costs that no other creditors are likely to advance. Thus, the Estate will only benefit, and will not have to incur any out-of-pocket costs, pursuing these claims. Movants intend to file applications consistent with Bankruptcy Code § 328 and Bankruptcy Rule 2014, seeking Court approval of the terms of employment and compensation of Valle Makoff and Potter Anderson.

6.     In its July 8, 2011 motion (the "Tolling Motion"),[3] the Debtor requested that this Court approve "Tolling Agreements" between the Debtor and the potential Insider defendants aimed at delaying these actions for as much as two years. As shown below, a two-year delay would provide no benefit to the estate, the Debtor, or the non-Insider creditors, but would only increase the risk that evidence will be lost (like the previous loss of hard drive data, of which the Court is aware), memories will fade, and judgments will become uncollectable, to the benefit of only the Insiders. In contrast, permitting Movants to proceed immediately on behalf of the estate will protect the estate, the Debtor, and all non-Insider creditors. For these and the other reasons set forth below, the Court should grant this Motion in full.

---

[3]     Debtor's Motion Pursuant to 11 U.S.C. § 363, 546, and 105(a) for Entry of an Order Approving Tolling Agreements, Docket No. 870.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and

1334.  This Motion is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper in this

district under 28 U.S.C. §§ 1408 and 1409.

## PROCEDURAL BACKGROUND

### A.      Commencement of the Case

8.      On February 16, 2009 (the "Shutdown Date"), the Debtor ceased business

operations, terminated most of its employees, and began to liquidate its assets.  On March 2,

2009 (the "Petition Date"), four of the Debtor's creditors filed a petition for involuntary relief

under chapter 7 of the Bankruptcy Code against the Debtor.[4]  The Debtor sought to dismiss the

case, and Movants opposed.  After a two-day trial, on December 30, 2009, this Court entered an

order for relief and converted the case to a case under chapter 11.[5]

9.      On March 26, 2010, Bauer Publishing Group and Kable Distribution Services,

Inc. (two of the Movants herein) moved for the appointment of a chapter 11 trustee or for

alternative relief, including the appointment of an examiner.[6]  On April 20, 2010, this Court

entered an order directing the appointment of an examiner.[7]  On April 27, 2010, the Office of the

United States Trustee appointed Don A. Beskrone as examiner (the "Examiner").[8]

### B.      The Examiner's Report

10.     Investigation.  The Examiner took more than one year to investigate and issue its

report.  On May 12, 2011, he filed the Examiner's Report, consisting of two parts: Part I, which

---

[4]     Docket No. 1.
[5]     Docket Nos. 189 & 190, respectively.
[6]     Docket No. 273.
[7]     Docket No. 315.
[8]     Docket No. 320.

PAC 1021709v.2

includes the Examiner's conclusions, and Part II, which consists of the analysis of FTI Consulting, Inc. ("FTI"), the Examiner's consultant and financial advisor.

11.     In his Report, the Examiner reviewed the Debtor's history, the organization of the industry in which the Debtor operated, events leading to the Debtor's decision to close on the Shutdown Date, and events that occurred after the Petition Date.

12.     The Examiner also conducted an extensive review of the law governing preference and fraudulent transfer claims ("Avoidance Action Claims"), fiduciary duty-based claims, and other claims, and suggested how that law might apply to transfers made by the Debtor to its Insiders before the Petition Date—transfers totaling hundreds of millions of dollars.

13.     Solvency. The Examiner engaged in a detailed analysis of the Debtor's solvency during the four years before the Petition Date, considering the tests for insolvency under both the Bankruptcy Code and Delaware common law.[9] In summary, the Examiner concluded that, under the Bankruptcy Code's "balance sheet" test, the Debtor was insolvent for the years 2005-09, inclusive, and that under Delaware's "reasonable prospects test" (applicable only to fiduciary-duty-based claims), it became insolvent on February 1, 2009.[10]

14.     Standard of Liability. The Examiner utilized what he called a "dismiss 'plus'" standard to analyze Avoidance Action Claims, taking into account, with respect to each transfer, the potential defenses that the transferee might assert. He stated that under this standard: "a claim or cause of action exists against an insider of the Debtor if there are facts sufficient to state a claim that is facially plausible giving due consideration to the viability of potential defenses that may likely be asserted (the "Report Standard")."[11]

---

[9]     Examiner's Report, Part I, pp. 112-128.
[10]    Id., Part I, at 126-28. See also FTI's solvency analysis, reaching the same conclusions, at id., Part II, at pp. 22-65.
[11]    Id., Part I, at 7.

PAC 1021709v.2

15.    Avoidance Action Claims.    The Examiner concluded that the estate holds

Avoidance Action Claims against the following Insiders, all of whom are affiliates of the Debtor:

Anderson Management Services, Inc.; Anderson News Company Southwest, LLC; Anderson

Services, LLC; Brookvale Holdings, LLC; Display Services, Inc.; First Media Capital

Corporation; Magazine Information Network, LLP; MSolutions, LLC; Prologix Distribution

Services East, LLC; and Twin Rivers Technology Group, LLC.

16.    These Avoidance Action Claims alone total more than $69 million, and all of

them satisfy the Report Standard of dismiss "plus." Of the total, more than $64 million consists

of claims against the following six Insiders:

| Insider | Basis of Claim | Amount | Note |
|---|---|---|---|
| First Media Capital Corporation ("FMC") | Preference | $22,355,552 | Paid under FMC Revolver w/in 90 days before Petition Date |
| FMC | Preference | $14,067,320 | Paid under FMC Factoring Agreement w/in 90 days before Petition Date[12] |
| Anderson Management Services, Inc | Fraudulent Transfer | $8,338,000 | Amount paid by Debtor in excess of contract amount during four-year prepetition period |
| MSolutions, LLC | Fraudulent Transfer | $2,161,000 | Payments for which Debtor did not provide adequate documentation |
| Anderson Services, LLC[13] | Fraudulent Transfer | $10,003,000 | Payments for which Debtor did not provide adequate documentation |
| Brookvale Holdings, LLC[14] | Fraudulent Transfer | $1,811,000 | Payments for which Debtor did not provide adequate documentation |
| Twin Rivers Technology Group, LLC | Fraudulent Transfer | $7,658,000 | Payments for which Debtor did not provide adequate documentation |
| **Total:** | | **$66,393,872** | |

---

[12]    The Examiner concluded that the FMC Factoring Agreement, denominated a sale of receivables, should be recharacterized as a loan, making the Debtor's payments to FMC thereunder subject to challenge as preferences. Id., Part I, at 204-12.

[13]    According to the Debtor, Anderson Services, LLC has entered into an Assignment for the Benefit of Creditors under Tennessee law and is "defunct." Tolling Motion 7, n.1.

[14]    Brookvale holds 100% of the membership interests in the Debtor. Examiner's Report, Part I, at 44.

6

17.     The Examiner investigated several other transactions between the Debtor and its affiliates, but could not determine whether any of them might give rise to an Avoidance Action Claim.

18.     For example, in December 2006, the Debtor sold its wholly owned subsidiary, Twin Rivers Technology Group, LLC ("Twin Rivers"), to Brookvale (the Debtor's parent), for a total price of $1,000. In part because FTI was not asked to perform an appraisal of Twin Rivers as of the spinoff date, and for other reasons, the Examiner was unable to conclude whether $1,000 was a fair price for Twin Rivers.[15]

19.     In its separate analysis of the Twin Rivers transaction, however, FTI concluded that, "[i]t therefore appears, given the various facts and circumstances described above, that [the Debtor] did not receive reasonably equivalent value when its Twin Rivers interest was sold to Brookvale for $1,000."[16]

20.     Fiduciary Duty-Based Claims.  The Examiner also reviewed potential claims against the Debtor's officers for breach of fiduciary duty ("Fiduciary Duty-Based Claims") which Movants believe are viable despite the Examiner's opinion that such claims cannot be asserted.

21.     The Examiner first decided that while Delaware state law permits creditors to bring such breach of fiduciary duty claims against corporations, it does not permit creditors to assert such claims derivatively against an LLC's members, relying on a recent Court of Chancery decision that is currently on appeal. CML, V, LLC v. Bax, 6 A. 3d 238 (Del. Ch. 2010).[17] Application of the CML decision would lead to inconsistent treatment of creditors of

---

[15]     Examiner's Report, Part I, at 285-88. The Examiner concluded that the Debtor was insolvent at the time of the transfer. Id.
[16]     Id., Part II, at 193.
[17]     Id., Part I, at 258-61.

7

corporations compared to creditors of limited liability companies, a policy issue the appellate court may determine is a basis for reversal.[18]

22.     The Examiner also rejected the Fiduciary Duty-Based Claims on the basis that, until the Debtor shut down its doors, it was solvent for state law purposes (even though insolvent under Federal law), based on the so-called "no reasonable prospects" standard under Delaware law.  Movants believe the Examiner's analysis and application of the "no reasonable prospects" standard is misplaced.  In concluding that the "reasonable prospects" test applies to fiduciary duty claims, the Examiner relied principally on In re Teleglobe Commc's Corp., 392 B.R. 561 (Bankr. D. Del. 2008), which in turn relied on *dicta* from some earlier cases, which arose from very old receivership cases.  Movants are not aware of any Delaware state court that has ruled that the "no reasonable prospects" test applies to fiduciary duty claims and believe that application of the "no reasonable prospects" standard in this context is not consistent with Delaware law.

23.     The Examiner identified at least two fiduciary duty claims with potential merit if the Debtor was insolvent (*i.e.*, if the "reasonable prospects" test is inapplicable):  the FMC factoring arrangement and the Twin Rivers divestiture (for $1,000 consideration).[19]  The Examiner also concluded that the EDC Music sale might have been conducted through an unfair process, which alone could give rise to a fiduciary duty claim.[20]

24.     Equitable Subordination Claims.  The Examiner also considered whether the claims of Insiders might be subject to equitable subordination (as potentially asserted by the estate, the "Equitable Subordination Claims").  He did not find a basis to equitably subordinate

---

[18]     In any event, this Court has the equitable power to grant standing to any interested party, including a creditor, to pursue the estate's claims if the Debtor will not do so.  See In Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548 (3d Cir. 2003) (en banc) and discussion below.

[19]     Examiner's Report, Part I at 283-288

[20]     Id. at 280-283

8

PAC 1021709v.2

the claims of Insiders Holston Asset Management, LLC ("Holston") or Northshore Capital, LLC ("Northshore"), based solely on their extensive purchase of prepetition claims. But he suggested that subordination might be appropriate if it was determined that Holston and Northshore's claim purchases gave them an unfair advantage in the plan confirmation process, and he quoted from a hearing transcript in which the Court expressed concern about Holston and Northshore's actions.[21]

25.     Lien Avoidance Claims.     It does not appear that the Examiner conducted an analysis to determine whether the liens of SunTrust Bank or the liens of Holston, as SunTrust's successor, might be subject to avoidance, either because of inadequate documentation or perfection or for any other reason (as such claims may be asserted by the estate, "Lien Avoidance Claims"). The Debtor's DIP facility with Holston precludes the Debtor from challenging Holston's liens.

26.     By stipulation, Holston and the Debtor have agreed to extend the "Challenge Period"—the period within which Holston's liens may be challenged—to July 29, 2011. If a third party files a motion for standing to assert the Lien Avoidance Claims on or before that date, the Challenge Period is further extended to the later of August 29, 2011 or five days after a ruling on that motion.[22]

27.     To the best of Movants' knowledge, no party-in-interest other than Movants intends to seek standing to investigate and, if appropriate, assert the Lien Avoidance Claims.

---

[21]     Id., Part I, at 86-105, 213-18 and n.1040. In April 2009, Holston purchased at face value the claims of SunTrust, the Debtor's secured lender, for approximately $30.5 million. After the Petition Date, Northshore used "family money" to purchase approximately $63 million in unsecured claims.

[22]     Agreement Extending Challenge Period Under the July 1, 2010 Order, Docket No. 409.

## C.    The 2004 Order

28.    On March 30, 2010, three of the Movants herein—American Media, Inc., Curtis Circulation Company, LLC, and Time/Warner Retail Sales & Marketing, Inc. (the "2004 Movants")—filed their motion (the "2004 Motion") for authorization to conduct examinations under Bankruptcy Rule 2004, on the following subjects: "(a) transfers of funds and other property of [the Debtor] to affiliates controlled by Anderson Media, (b) the decision of [the Debtor] to cease operations, (c) the validity, priority and perfection of liens and security interests asserted by Holston, and (d) other subjects that come to light in the course of examining the foregoing matters and that may affect the administration of the case."[23]

29.    On April 20, 2010, this Court entered its order (the "2004 Order") granting the 2004 Motion, authorizing the 2004 Movants to take discovery of the Debtor, Holston, Northshore, and Anderson Media Corp., approving the discovery requested in the 2004 Motion, but not permitting discovery on the issues in the Antitrust Action (as defined below).

## D.    The Tolling Motion

30.    To date, the Debtor has not sought to pursue any of the potential claims identified in the Examiner's report. Instead, the Debtor's sole response to the Examiner's Report has been to file the Tolling Motion. In the Tolling Motion, the Debtor seeks approval of proposed "Tolling Agreements" with the Insiders, under which Bankruptcy Code § 546's two-year limitations period governing the Avoidance Action Claims would be tolled until the earlier of (a) two years or (b) 90 days after either party notifies the other that the Tolling Agreement is terminated.[24] (At present, the two-year limitations period expires on December 30, 2011).

---

[23]    Motion of Certain Magazine Creditors for an Order Authorizing Examinations Pursuant to Bankruptcy Rule 2004, dated March 30, 2010, Docket No. 275.

[24]    Tolling Motion at 9, ¶ 27, first bullet point.

31.     As shown below, delaying the prosecution of the estate's substantial claims would benefit only the Debtor's Insiders, not the estate or its creditors.

**E.      The Antitrust Action**

32.     On March 22, 2009, the Debtor and its affiliate Anderson Services commenced an action in the Southern District of New York against ten defendants, including the five Movants, alleging that they had entered into an illegal agreement in violation of federal antitrust laws (the "Antitrust Action"). The Antitrust Action is styled <u>Anderson News, LLC, et al. v. American Media, Inc., et al.</u>, Case No. 09-Civ-2227 (PAC).

33.     On August 2, 2010, the District Court hearing the Antitrust Action issued its opinion and order granting defendants' motion for dismissal of the Antitrust Action with prejudice, without leave to amend (the "Dismissal Order").

34.     The Debtor moved for reconsideration of the Dismissal Order and the District Court denied the Debtor's motion for reconsideration. The Debtor has appealed from the Dismissal Order, and the parties have completed briefing. The Second Circuit has not yet scheduled arguments.

35.     The Debtor's belief that the Antitrust Action, if successful, will resolve significantly all of the outstanding issues in their chapter 11 case is the sole basis advanced for granting the relief sought in the Tolling Motion rather than immediately pursuing the claims.

<strong><u>RELIEF REQUESTED</u></strong>

36.     In this Motion, Movants request that the Court enter an order granting the following relief: Granting derivative standing and authority to Movants to investigate further the Avoidance Action Claims, the Fiduciary Duty-based Claims, the Equitable Subordination Claims, the Lien Avoidance Claims, and other claims against the Insiders that Movants'

11

investigation may uncover (collectively, the "Derivative Claims"), and as appropriate to prosecute the Derivative Claims on behalf of the estate.

## BASIS FOR RELIEF

### I.   A Bankruptcy Court May Grant Derivative Standing To A Creditor To Sue On The Estate's Behalf

37.    In <u>Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery</u>, 330 F.3d 548 (3d Cir. 2003) (en banc), the Third Circuit confirmed that a bankruptcy court, in the exercise of its equitable powers, may grant derivative standing to a creditors' committee to prosecute the estate's causes of action when the debtor has wrongfully refused to do so.

38.    The <u>Cybergenics</u> panel cited several sections of the Bankruptcy Code in support of its conclusion, including: § 1109(b) (any party in interest, including committee or creditor, may "raise and may be heard on any issue in a [chapter 11] case") and § 503(b)(3)(B) (court may order compensation to creditor who "recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor"). 330 F. at 560-66.

39.    Ultimately, the Third Circuit concluded that the bankruptcy court's status as a court of equity empowers it to authorize third parties to sue on the debtor's behalf. <u>Id.</u>, at 567-69. The Third Circuit explained: "We believe that the ability to confer derivative standing upon creditors' committees is a straightforward application of bankruptcy courts' equitable powers." <u>Id.</u>[25]

40.    <u>Cybergenics</u> involved the derivative standing of a creditors' committee, but under the same principles a court may grant derivative standing to individual creditors. In <u>Infinity Investors Ltd. v. Kingsborough (In re Yes! Entertainment)</u>, 316 B.R. 141, 145 (D. Del. 2004), in

---

[25]     The Third Circuit noted that it was common under the former Bankruptcy Act for bankruptcy courts to grant derivative standing to creditors to sue on the estate's behalf, citing cases dating to as early as 1900 and the pre-Code edition of Collier on Bankruptcy. 330 F.3d at 569-72.

which an individual creditor sought derivative standing, the district court found it was proper for the bankruptcy court to grant individual creditors derivative standing to pursue claims on behalf of the estate. The Infinity Investors court stated, "[a]lthough the Third Circuit [in Cybergenics] discussed creditors' committees specifically, the Court is persuaded that its decision is applicable here." See also Fogel v. Zell, 221 F.3d 955, 965-66 (7th Cir. 2000) ("If a trustee unjustifiably refuses a demand to bring an action to enforce a colorable claim, the creditor may obtain the permission of the bankruptcy court to bring the action in place of, and in the name of, the trustee" (emphasis added; citations omitted).

41. Similarly, in Hyundai Translead, Inc. v. Jackson Truck & Trailer Repair, Inc. (In re Trailer Source, Inc.), 555 F.3d 231 (6th Cir. 2009), the court recognized that a single creditor may be granted standing in a chapter 7 case, observing that "[t]here is no textual basis for different treatment [of the derivative standing issue] in chapter 7 cases" and chapter 11 cases.

42. Standing for individual creditors to bring avoidance and recovery actions is implicitly recognized in the Bankruptcy Code. Section 503(b)(3)(B) provides that a creditor is entitled to an administrative claim for expenses incurred if the creditor "recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor." 11 U.S.C. § 503(b)(3)(B).

43. Such language clearly contemplates that bankruptcy courts can and will grant creditors standing and authority to recover property. Avoidances of transfers under sections 544, 547 and 548 of the Bankruptcy Code and recovery of those transfers under section 550 of the Bankruptcy Code clearly fall within the language of section 503(b)(3)(B).

44. Accordingly, this Court has unquestioned authority to authorize Movants to sue on behalf of the Debtor's estate.

13

## II.    Movants Satisfy The Guidelines For Derivative Standing

45.    Delaware bankruptcy courts uniformly hold that a committee or creditor seeking derivative standing must satisfy three guidelines, all of which are satisfied here.  The district court in <u>Yes! Entertainment</u> outlined these guidelines as follows:  "Under these guidelines generally, derivative standing requires: (1) a colorable claim, (2) that the trustee unjustifiably refused to pursue the claim, and (3) the permission of the bankruptcy court to initiate the action." 316 B.R. at 145; <u>In re Centaur, LLC</u>, 2010 Bankr. LEXIS 3918, at *13 (Bankr. D. Del. Nov. 5, 2010) (same).

46.    As shown below, Movants satisfy these three guidelines.

### A.    The Examiner's Report Establishes That The Avoidance Action Claims Are "Colorable"

47.    Courts hold that a claim is "colorable" for purposes of derivative standing if the claim would survive a motion to dismiss:  "In deciding whether there is a colorable claim, the court should undertake the same analysis as when a defendant moves to dismiss a complaint for failure to state a claim."  <u>In re Centaur, LLC</u>, <u>supra</u>, 2010 Bankr. LEXIS at *13.

48.    As explained above, the Examiner utilized what he called a dismiss "plus" standard (or the "Report Standard") to analyze the Debtor's potential claims against its Insiders. That is, in each instance, the Examiner first considered whether the facts supported a <u>prima facie</u> claim against the Insider sufficient to withstand a motion to dismiss.  Then, the Examiner considered affirmative defenses that might be available to the Insider.[26]

---

[26]    The Examiner explained his approach as follows:

In employing this standard, the Examiner has assessed potential claims in light of the Supreme Court's recent decisions re-evaluating Federal Rule of Civil Procedure 8 and the pleading standards required to withstand dismissal under Rule 12(b)(6). These decisions make clear that a plausible claim for relief is required to withstand a motion to dismiss in all civil actions, and further elucidate that a claim is "facially plausible" when it allows a court to "infer more than the mere possibility of misconduct.". . .

49.     By definition, therefore, the Examiner's Report Standard—the dismiss "plus" standard—is a stricter standard than courts use to determine whether a claim would survive a motion to dismiss and would be "colorable" for derivative standing purposes. It follows that, in the Examiner's view, the $69 million in Avoidance Action Claims are undoubtedly "colorable," and Movants should be permitted to prosecute them. Indeed, the Debtor would not have proposed the Tolling Agreement if the claims were not even colorable.

50.     As noted above, in its 2004 Order this Court granted to certain of the Movants authority to conduct 2004 examinations with respect to the Lien Avoidance and Fiduciary Duty-Based Claims. If the Court grants derivative standing to Movants to prosecute the Avoidance Action Claims, then for the sake of efficiency Movants should also have authorization to prosecute all Derivative Claims, to the extent that their investigation determines that any of them have merit.

**B.      It Would Be Futile To Demand That The Debtor Sue**

51.     The second guideline for derivative standing requires that the trustee (or debtor) have unreasonably refused to sue. In making this determination, Delaware bankruptcy courts recognize that if demand would be futile because the debtor is conflicted, the demand requirement is excused. See Official Committee of Unsecured Creditors v. Cablevision Systems Corp. (In re Valley Media, Inc.), 2003 B.R. LEXIS 940 at *6 (Bankr. D. Del. Aug. 14, 2003) ("where, as here, a debtor's counsel has a conflict of interest in pursuing an estate claim so that it

---

In addition to his adoption of the standard necessary to survive dismissal under Rule 12(b)(6), the Examiner has considered certain potential defenses to identified claims and causes of action. In doing so, the Examiner is mindful of the principle that courts generally refuse to rely upon affirmative defenses in resolving motions to dismiss under Rule 12(b)(6). In light of the Examiner's ultimate objective, however, the Examiner has considered certain potential defenses, including affirmative defenses, to claims and causes of action that may otherwise be prohibited in the context of a strict Rule 12(b)(6) analysis. This motion to dismiss "plus" standard is appropriate, the Examiner believes, because precluding consideration of affirmative defenses would provide little utility to the Court or parties-in-interest.

Examiner's Report, Part 1, 7-8.

is effectively disqualified from pursing an action which is otherwise a colorable claim, the debtor (or a trustee) can be viewed as delinquent and the creditors' committee should be authorized to pursue the cause of action.").

52.     Other courts agree. See, e.g., Louisiana World Expo., Inc. v. Federal Ins. Co. (In re Louisiana World Expo., Inc.), 832 F.2d 1391, 1397 (5th Cir. 1987) (debtor would not have sued officers and their D&O insurer even if committee had made formal request; committee permitted to proceed); Official Committee of Unsecured Creditors v. Clark (In re National Forge Co., 326 B.R. 532, 544-46 (W.D. Pa. 2005) (demand futile where debtor's employees and insiders were potential defendants; failure to make demand not impediment to suit); In re First Capital Holdings Corp., 146 B.R. 7 (Bankr. C.D. Cal. 1992) (demand excused as futile where committee proposed to sue members of debtor's board of directors and principal shareholder).

53.     Here as in the cases cited above demand would be futile because of the Debtor's conflicts of interests.   For example, as shown above, the Debtor's sole equity owner— Brookvale—is a potential defendant, both with potential fraudulent transfer liability of as much as $1.8 million and additional potential liability in connection with the Twin Rivers transaction.

54.     Moreover, the only members of the Debtor's Management Committee (the LLC's equivalent of a Board of Directors) are Charles C. Anderson, Jr. and Joel Anderson—two members of the founding family that still controls the entire, privately held Anderson Media family of companies.[27]  Mssrs. Anderson have held and, on information and belief continue to hold, senior executive positions with Anderson Media, Brookvale, Anderson Services, LLC, Anderson Management Services, Inc., MSolutions, LLC, and First Media Capital Corporation.[28] All of these entities are potential defendants.

---

[27]     Examiner's Report, Part I, at 44-45.
[28]     Id., at 45 notes 190 & 191.

16

55. Finally, the Debtor has no employees. The only individuals performing services for the Debtor are four employees of potential defendant Anderson Management Services, Inc.[29]

56. In light of these obvious conflicts, there is no basis to conclude that the Debtor, which has already sought to delay pursuit of these claims for two years, is ready, willing and able to vigorously prosecute these actions against its parent company, the employer of its managers, and other Insiders. Accordingly, the Court should excuse the requirement that Movants make a demand that the Debtor sue.[30]

### C.    The Debtor Has Already Shown It Is Unwilling To Sue

57. As noted above, in the Tolling Motion, the Debtor requests an order authorizing the Debtor to enter into "Tolling Agreements" with each Insider defendant, under which the statute of limitations governing actions against the Insider would be tolled until the earlier of (a) two years after the Tolling Agreement's effective date; or (b) 90 days after either party notifies the other that the Tolling Agreement is terminated.

58. On its face, the Debtor's request to delay for two years the prosecution of these substantial claims demonstrates an obvious unwillingness to pursue these claims. Indeed, the stated goal of the Tolling Motion is to "kick the can down the road" in the hope that they never have to be brought against the Insiders.

59. First, this case is already more than two years old. It is simply unreasonable to put the case "on ice" and make creditors wait another two years before litigation is even commenced, and obviously much longer before they receive any distribution on their claims.

---

[29]    Id., at 20, n.58.
[30]    The Debtor has previously demonstrated its intend to shield the Insiders from scrutiny, first by effecting an assignment for the benefit of creditors rather than a bankruptcy case, and then by purchasing the claims of some creditors but not others to attempt to thwart the involuntary bankruptcy process.

17

60. Second, any substantial delay presents serious risks. The Examiner's Report notes that during the Examiner's investigation, data on a hard drive, including documents responsive to his discovery requests, became "unavailable."[31] Two more years of delay could result in the fading of witnesses' memories and loss of additional evidence—evidence that might be critical to one or more of the claims.

61. Delay could also make collecting judgments more difficult. As noted above, one defendant identified by the Examiner—Anderson Services, LLC—is already "defunct." During the two-year tolling, other potential defendants might go out of business, transfer their assets, or become judgment-proof. There is no reason to impose that risk on creditors.

62. The Debtor notes that its DIP loan agreements do not permit it to use DIP funds for litigation against Insiders.[32] That may be a reason why the Debtor cannot sue, but it is no argument against granting standing to another—like Movants—to prosecute these claims. To the contrary, it provides all the more reason why the Court should grant derivative standing to Movants, whose counsel has agreed to pursue the claims on a contingent fee basis that would not require use of DIP funds.

63. The Debtor's principal argument in the Tolling Motion to wait two years to prosecute the claims is based on the Antitrust Action. The Debtor appears to suggest that if (a) after hearing oral argument (not yet scheduled), the Second Circuit reverses the Dismissal Order and permits the Debtor to file an amended complaint; (b) the amended complaint survives motions to dismiss and for summary judgment; (c) the Debtor wins an enormous judgment at trial; and (d) the judgment is affirmed on appeal, the judgment may suffice to pay all its creditors

---

[31] Id., Part I, at 14-18.
[32] Tolling Motion, p. 34, ¶15.

in full, rendering prosecution of the Claims allegedly unnecessary.[33] The proposition that claims against Insiders an independent examiner has concluded are colorable should not be pursued because antitrust claims that have been dismissed with prejudice by a federal court are more valuable makes no sense at all.

64.     Regardless, creditors should not be required to wait for years on the basis of that remote possibility. If this Court permits Movants to prosecute the Derivative Claims immediately, any recoveries can be distributed promptly to creditors, perhaps under a liquidating reorganization plan. In the event that, years from now, the Debtor is able to resuscitate and win a substantial recovery in the Antitrust Action, it can apply that recovery to its creditors' remaining, unpaid claims, and retain any amount left over for itself or its equity holder.

65.     Permitting the Derivative Claims to proceed immediately protects both creditors and the estate—creditors will have a chance at the earliest possible distribution, and the Debtor can retain any benefits of the Antitrust Action. In contrast, the relief sought in the Tolling Motion would only benefit the Debtor's Insiders (*i.e.* the potential defendants), because it would delay suit against them while leaving in their possession the monies subject to the Avoidance Actions. But it means only further delay, uncertainty, and risk for the estate and creditors.

66.     Movants seek to prosecute colorable claims. Demanding that the Debtor sue would be futile—in fact, the Debtor has no intention of bringing the claims. Accordingly, this Court should grant derivative standing to Movants to prosecute the Derivative Claims. Indeed,

---

[33]     "[U]ntil the conclusion of the Antitrust Action Appeal, the ultimate recovery for unsecured creditors is uncertain (necessary for any preference claim), as is whether there will be *any* unsecured creditors." Tolling Motion, p. 34, ¶14.

absent granting the relief set forth in this Motion, the entire Examiner process—which took more than a year at substantial expense—would be for naught, a wasted effort.[34]

### D.     Prosecution Of The Derivative Claims Will Not Burden The Estate

67.     As explained above, Movants' proposed counsel—Valle Makoff and Potter Anderson—have agreed to handle this matter on a contingency-fee basis. Any recovery in the Derivative Claims will be paid to the estate or as directed by this Court, subject to reimbursement of expenses and counsels' claim for its contingency fee, all of which will be subject to this Court's approval. Moreover, the Movants have agreed to advance certain significant out-of-pocket costs, such as expert and e-discovery costs. It is unlikely any other creditors, or any other party for that matter, would be willing to advance such potentially significant costs of litigation in this matter. In addition, the litigation will not burden or interfere with the Debtor's ongoing business operations, because it has no ongoing business operations.

68.     Accordingly, if the Motion is granted, the estate will benefit from any recovery in the Derivative Claims, without incurring any risk or out-of-pocket costs.

### CONCLUSION

69.     The Avoidance Action Claims described in the Examiner's Report are obviously "colorable." Because this Court has already authorized Movants to investigate the remaining Derivative Claims, Movants should be authorized to prosecute any of those that have merit, as well. Demanding that the Debtor sue its Insiders would be futile and, in any event, the Debtor has already refused to sue. Permitting the Derivative Claims to be prosecuted immediately protects the estate from the risks of loss of evidence and uncollectibility, without prejudice to the Debtor, which can still pursue its Antitrust Action. Movants' proposed counsel will handle the

---

[34] Movants will file a separate response to the Tolling Motion, elaborating on these and other issues presented by that motion, including the fact that, as the Debtor concedes, there is a serious question whether, as a legal matter, § 546's two-year limitations period can be extended or is jurisdictional. See Tolling Motion at 11-15.

PAC 1021709v.2

matter on a contingency-fee basis, so the estate can only benefit if the Derivative Claims are prosecuted.

**NOTICE**

70.     Notice of this Motion has been provided to (i) the Debtor; (ii) the Office of the United States Trustee; (iii) counsel for the Insider Defendants; and (iv) all parties requesting notice pursuant to Bankruptcy Rule 2002, in accordance with Local Rule 2002-1(b).  In light of the nature of the relief requested herein, Movants submit that no other or further notice is necessary.

WHEREFORE, Movants respectfully request that the Court enter an order, substantially in the form attached hereto, granting (i) the relief requested in the Motion; and (ii) such other and further relief as is appropriate.

PAC 1021709v.2

Dated: July 29, 2011
     Wilmington, Delaware

**POTTER ANDERSON & CORROON LLP**


Stephen C. Norman (DE Bar No. 2686)
Jeremy Ryan (DE Bar No. 4057)
Ryan M. Murphy (DE Bar No. 5517)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: jryan@potteranderson.com
      snorman@potteranderson.com
      rmurphy@potteranderson.com

and

OF COUNSEL:

Jeffrey B. Valle, Esq.
**VALLE MAKOFF LLP**
11911 San Vicente Blvd., Suite 324
Los Angeles, CA 90049
Telephone: (310) 476-0300
Email: jvalle@vallemakoff.com

*Counsel for Movants American Media, Inc., Bauer
Magazine L.P., Bauer Publishing Company, L.P.,
Heinrich Bauer North America, Inc., Heinrich
Bauer Publishing, L.P., Curtis Circulation
Company, Kable Distribution Services, Inc., and
Time/Warner Retail Sales & Marketing, Inc.*

PAC 1021709v 2