# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) |
| | )    Chapter 11 |
| | ) |
| ANDERSON NEWS, LLC, | )    Case No. 09-10695 (CSS) |
| | ) |
| | )    **Hearing Date:**      **August 17, 2011** |
| | )                                **11:00 a.m.** |
| Debtor. | )    **Objection Deadline: August 10, 2011** |
| | )                                **11:00 a.m.** |
| | ) |

## OPPOSITION TO THE REQUEST TO AUTHORIZE DERIVATIVE STANDING

Holston Asset Management LLC ("**Holston**") and Northshore Capital LLC ("**Northshore**"), creditors and parties in interest, hereby file this opposition to the *Motion of Certain Magazine Creditors for Order Granting Standing and Authority to Prosecute Avoidance and Other Actions on Estate's Behalf* [Docket No. 895] (the "**Derivative Standing Motion**").[1] Because American Media, Inc., Curtis Circulation Company, LLC, Time/Warner Retail Sales & Marketing, Inc., Bauer Publishing Company, L.P., and Kable Distribution Services, Inc. (the "**Magazine Creditors**") have failed to establish that both *colorable* claims exist and that the Debtor has *unjustifiably* refused to pursue those as required by the Third Circuit's decision in *Official Comm. of Unsecured of Cybergenics Corp v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003), the Derivative Standing Motion should be denied.

I.     **THE MAGAZINE CREDITORS' ASSERTION IN THE DERIVATIVE STANDING MOTION THAT THERE ARE COLORABLE CLAIMS TO CHALLENGE THE SUNTRUST/HOLSTON LIENS BECAUSE "It does not appear that the Examiner conducted an analysis to determine whether the liens of SunTrust Bank or the liens of Holston, as SunTrust's successor, might be subject to avoidance . . . ." IS FALSE**

---

[1]     Any capitalized terms not defined herein shall have the meaning given to them in the Derivative Standing Motion.

1.     On page 9, paragraphs 25-27, and page 11, paragraph 36, of the Derivative

Standing Motion, the Magazine Creditors argue that: "It does not appear that the Examiner

conducted an analysis to determine whether the liens of SunTrust Bank or the liens of Holston,

as SunTrust's successor, might be subject to avoidance . . . ." This assertion is false.

2.     Throughout the Examiner's Report (Docket Nos. 805, 852), the Examiner

is explicit with respect to the extent, validity, and priority of the lien and claim formerly held by

SunTrust and later assigned to Holston (the "**SunTrust/Holston Secured Claim**"). For

example, on page 87 of the Examiner's Report, he states as follows:

> The Examiner has discerned no facts or basis to conclude that SunTrust is
> an "insider" or "affiliate" of the Debtor. Although not an "insider" or an
> "affiliate" for purpose of this examination, ***the Examiner nevertheless
> undertook a review and analysis of the validity, priority, and extent of
> SunTrust's asserted liens and security interests as of the Petition Date***.
> The Examiner did so given the purchase by Holston (an insider of the
> Debtor) of rights under the SunTrust Credit Facility. ***In connection
> therewith, the Examiner found no basis to challenge or avoid any such
> lien or security interest (as previously held by SunTrust, or as currently
> held by Holston), or any transfers made on account of it***.

Examiner's Report p. 87, n. 438 (emphasis added).

3.     In the face of the Examiner's explicit findings that there is "***no basis to

challenge or avoid any such lien or security interest (as previously held by SunTrust, or as

currently held by Holston), or any transfers made on account of it[.],***" there is no colorable

claim.

4.     Page 87 is not the only place where the Examiner addressed the

SunTrust/Holston Secured Claim in his Report. For example, the Examiner continued his

analysis of the SunTrust/Holston Secured Claim on page 156 of the Examiner's Report. The

Examiner determined as follows with respect to transfers to SunTrust during the involuntary gap

period and whether they were recoverable under Section 549, and the details of his analysis are

in the Report.

> [772] 2 COLLIER ON BANKRUPTCY, supra note 667, ¶ 303.24[1]. Here, ***the Examiner concludes there is no material claim that may be asserted against an insider on account of any "gap period" transfers***. While the Examiner understands that certain transfers were made to insiders, such transfers were either insignificant, ***or were made on account of the secured debt obligations owed to SunTrust and, later, to Holston***. More specifically, the Debtor made one payment to Anderson Management, in the amount of $34.42, on October 5, 2009. This transfer to Anderson Management was de minimis, and, therefore, the Examiner has not undertaken a review thereof, or drawn any conclusion as to whether any claim may be asserted. Moreover, *even if the payments made to SunTrust and Holston during the Gap Period could be avoided under section 549 and returned to the Estate, any such efforts would be "futile."* Fleet Nat'l Bank. v. Gray (In re Bankvest Cap. Corp.), No. 01-4387, 2003 WL 1700978, at \*7 (D. Mass. Mar. 28, 2003). *Because of its blanket lien on substantially all of the Debtor's assets, SunTrust (and later Holston) would simply be "returned to the 'status quo' at the time of the gap period payments[,]" and left with a claim under section 502(h) and a security interest in the returned funds. Id. As a result, no benefit would be achieved for the Debtor or its Estate.*

Examiner's Report p. 156, n. 772 (emphasis added).

5. The Examiner also discussed the SunTrust/Holston Secured Claim on pages 168 and 172-173 of his Report. The Examiner determined as follows in considering *Deprizio* issues, and the full details of his analysis are in his Report.

> While the total amount owed by the Debtor to SunTrust during the one year period fluctuated (to a maximum of $86,145,244 on October 1, 2008), as of February 4, 2009, SunTrust was owed $79,405,011. By the Petition Date, the amount owed to SunTrust was reduced to $50,478,799. Because Anderson Media was an insider and grantor of a pledge that secured the Debtor's obligations to SunTrust, the Examiner has reviewed the transfers made by the Debtor to SunTrust to determine whether there is a basis to avoid and recover such transfers under sections 547 and 550.

Examiner's Report p. 168 (internal footnotes omitted).

> The Examiner concludes no action exists to avoid and recover any payments made to SunTrust because such payments conferred no corresponding benefit on Anderson Media. Because SunTrust maintained a blanket lien on substantially all of the Debtor's assets, any payment by the Debtor to SunTrust yielded no better result for SunTrust than it would

- 3 -

have obtained in a chapter 7 liquidation – a return of its own collateral. Likewise, Anderson Media did not receive any corresponding benefit on account thereof as its contingent liability, if any, was not improved, nor were creditors (or the Estate) harmed by such payments.[846]

> [846] See El Paso Refinery, 171 F.3d at 179-80 ("If the non-insider creditor holds collateral sufficient to secure the antecedent debt in full at the time of the transfer, payment on the primary debt produces no cognizable 'benefit', whether or not an insider, since the insider has no exposure on the debt at the time of the transfer.") (citations omitted). Moreover, while SunTrust was not a subject of the examination, the analysis of a potential insider preference to Anderson Media necessarily required an analysis of any potential preferential transfer made to SunTrust. The Examiner concludes that no action exists against SunTrust regardless of any under-security, as it maintained a blanket lien on substantially all of the Debtor's assets, and all payments on account of debt owed to it necessarily came from its collateral. See id. Moreover, even in the face of an action to avoid and recover transfers made to or for the benefit of Anderson Media, SunTrust has the benefit of additional protection under sections 547(i) and 550(c) of the Bankruptcy Code.

Examiner's Report p. 168.

      6.     The issue of the extent, validity and priority of the SunTrust/Holston Secured Claim was also previously tried before this Court. On February 2, 2010, in connection with Holston's motion for relief from the automatic stay and the Magazine Creditors' objection to that motion, the Court conducted a painstaking and detailed hearing wherein each of the relevant loan documents was identified and admitted into evidence after the objecting Magazine Creditors declined to stipulate to the authenticity of the Holston/SunTrust loan documents. *See* the February 2, 2010 Hearing Transcript (Docket No. 240) at pages 11, 48, 7-49.

      7.     The Court's ruling was straightforward:

48

10    THE COURT: Okay. First, we have an uncontested
11    evidentiary record in support of the motion clearly
12    establishing all of the evidentiary basis necessary to grant
13    the motion. I'm going to grant the motion.

14     Second, I've looked at the form of order. It's about
15     as vanilla as it gets. Motion is granted. Automatic stay is
16     terminated. To -- as to the collateral, Holston is allowed to
17     exercise its contractual and non-bankruptcy rights with respect
18     to the collateral. It doesn't get much more vanilla than that.
19     I'm going to approve that form of order.

*Id.* at 48.

8.     In considering the Magazine Creditors' request to conduct a new investigation of the SunTrust/Holston Secured Claim, it is worth noting that the Magazine Creditors have had the loan documents for more than 16 months and, in addition to responses to their separate discovery requests, contemporaneously received a copy of every document (other than certain antitrust confidential documents) that were produced to the Examiner by the Debtor and its affiliates including Holston and Northshore.[2]

9.     The Examiner also analyzed Holston's acquisition of the SunTrust claim and liens on pages 213-218 of the Examiner's Report and concluded as follows:

> Here, both Holston and Northshore are insiders[1034] such that their conduct, including in connection with the acquisitions of various claims, is subject to heightened scrutiny. Even through that lens, the Examiner's investigation failed to reveal any misconduct – whether by Holston or Northshore – that would provide a basis for the subordination of their claims.
>
> [1034] See supra § V.C.2.a. Moreover, the officers and directors of the Debtor, Holston and Northshore may share responsibilities.

Examiner's Report at p. 215.

> There is no evidence that Holston used its close position with the Debtor to gain unfair advantage or influence over the Debtor, its creditors or SunTrust. The examination has shown the nature, length and tenor of negotiations between the parties. Holston did not receive a "sweetheart" deal; it paid dollar for dollar for a claim that SunTrust would otherwise have asserted against the Debtor and its Estate. In that circumstance, the Examiner has found no basis to conclude that any harm was suffered by

---

2     Conversely, the documents that were produced by the Magazine Creditors have not been provided to the Debtor, or to Northshore and Holston.

any creditors . Even if Holston had acted inequitably in its purchase of SunTrust's secured claim sufficient to warrant equitable subordination, the Examiner's investigation failed to yield any evidence that Holston's actions caused the Debtor or its remaining creditors harm. Thus, the Examiner concludes there is no basis to equitably subordinate Holston's claims.

Examiner's Report pp. 215-16.

> In short, the Examiner found no evidence of manipulation or inequitable gain by Holston or Northshore. Even if the Examiner had concluded that the actions of Holston and Northshore rose to the level of inequitable conduct, he has found no evidence that such actions caused any injury to the Debtor's remaining creditors (i.e., the SDNY Defendants).

Examiner's Report p. 217.

10.    Although, in his discussion of equitable subordination the Examiner noted that he would not speculate on whether, *in a plan context for voting purposes*, there might be a basis for subordinating the SunTrust claim acquired by Holston or the claims acquired by Northshore, the Examiner did not find a "*colorable*" claim for affirmative relief. In fact, the Examiner did not find that such a claim existed. The Examiner's statement was as follows:

> [1040]    See Kreisler, 546 F.3d at 867. Whether and to the extent Holston or Northshore may obtain an unfair advantage in the context of plan confirmation (if one is to be proposed) is ***uncertain at this time***. Therefore, ***this Report does not speculate on such future events*** and whether subordination, in that context, may be warranted. See Citicorp, 160 F.3d at 989-90 (finding that the purchase of claims to secure a controlling position over a reorganization for self-interested purposes supports the finding of "injury or unfair advantage" and the application of equitable subordination).

Examiner's Report at p. 217, n. 1040 (emphasis added).

11.    Moreover, the possible impact that the Holston and Northshore acquisitions may have on the future issue of treatment of a vote on a plan which has not been filed by anyone is not an issue which merits derivative standing. Moreover, contrary to the Magazine Creditors' argument, the Examiner did not find that such a claim existed. The

- 6 -

Examiner said he would not address it. Further, whether or not the acquired SunTrust claim and the acquired claims of unsecured creditors are impacted for voting will not affect their entitlement to full and equal treatment as a secured claim for the SunTrust/Holston claim, and as unsecured claims entitled to equal treatment with respect to other unsecured creditors. The Magazine Creditors' interpretation of the Examiner's Report on page 8, para. 24 of the Derivative Standing Motion is inaccurate and materially overstates what the Examiner said.

12.     In summary, with respect to the SunTrust/Holston Secured Claim, no colorable claim has been presented. While courts have articulated different prongs or approaches to derivative standing, a showing of a colorable claim is the core and universal requirement. *See Cybergenics*, 330 F.3d at 571 (discussing various approaches taken by courts in granting derivative standing). Without showing that it is possible to challenge the SunTrust/Holston Secured Claim, there can be no finding that the Debtor "unjustifiably" refused to do so.

13.     As discussed further below, what may have served as the basis for an investigation by a third party, unbiased, independent examiner is not, by extension, a sufficient basis to prosecute claims the Examiner found did not exist. This case is no longer at the "when there's smoke there's fire" stage.[3] An independent examination has been completed and that examination determined that with respect to the SunTrust/Holston claims and liens, there is no colorable claim.     Accordingly, the request for derivative standing with respect to the

---

[3]     At the December 30, 2009 hearing on a motion to dismiss the involuntary petition, the Magazine Creditors argued that an order for relief was necessary so that an independent fiduciary could examine "three-quarters of a billion dollars" in prepetition transfers to affiliates. In closing argument, counsel for the Magazine Creditors argued: "What I intended to say is where there's smoke, somebody ought to check out whether there's a fire. There ought to be an investigation. When the smoke alarm goes off, you don't say, uh, don't worry about it. There ought to be an investigation." December 30, 2009 hearing transcript [Docket No. 204], page 94, lines 9-10, 15-19.

- 7 -

SunTrust/Holston claims and liens should be denied.

14.     While not a basis for denying derivative standing, as set forth in the July 27, 2011 *Debtor's Motion for Entry of (I) An Order Approving (A) the Seventh Amendment to the Debtor-in-Possession Credit Agreement and (B) the Increase in the Credit Amount Under the Debtor-in-Possession Credit Agreement and (II) An Order Acknowledging the Challenge Period Has Expired* (Docket No. 892), Holston has made it a condition of increasing the DIP that the Court enter an order recognizing that the Challenge Period under the March 2, 2010 DIP Order has expired. Significantly, Holston has never forced the issue of obtaining the benefits of the Debtors' Stipulations that were approved on March 2, 2010, while the Examination was in process. To the contrary, Holston extended the Challenge Period deadline until 60 days after the filing of the Examiner's Report and continued to fund its DIP loan throughout the period of the Examination. Now that a $4.1 million Examination has been concluded in which the Examiner determined that there is "***no basis to challenge or avoid any such lien or security interest (as previously held by SunTrust, or as currently held by Holston), or any transfers made on account of it***," there is no reason for further delay in recognizing that the Challenge Period has expired.

## II.     NO COLORABLE FIDUCIARY DUTY CLAIMS EXIST WITH RESPECT TO ANDERSON NEWS' OFFICERS AND DIRECTORS

15.     With respect to the Fiduciary Duty-based Claims (as defined in the Derivative Standing Motion),[4] other than the Examiner's conclusion that the Debtor may have

---

[4]     In the Derivative Standing Motion, Avoidance Actions are given the general definition of "preference and fraudulent transfer claims." Derivative Standing Motion ¶ 12. Fiduciary Duty-Based Claims are given the general definition of "potential claims against the Debtor's officers for breach of fiduciary duty." Derivative Standing Motion ¶ 20. Equitable Subordination Claims are given the general definition "the claims of Insiders might be subject to equitable subordination." Derivative Standing Motion ¶ 24.

paid between $263,734 to $311,624 in excess interest to FMC in connection with the FMC

Revolver, the Examiner made the following conclusions:

(i) "[T]he Examiner has found **no evidence of intentional fraud** in connection with transfers made or obligations incurred by the Debtor." Examiner's Report p. 165 (emphasis added).

(ii) "In the course of the Examiner's investigation, suggestions have been made that the Debtor's pursuit of the surcharge initiative was the culmination of a long planned and carefully timed scheme by the Debtor (and/or its owners) to exit a business in which it had lost money for a number of years. The hypothesis is that the Debtor would transfer as much value as possible to its insiders, cease operations, and leave non-insider creditors with nothing. The Examiner has **not discovered any evidence that would support such a scheme**." Examiner's Report p. 224 (internal footnote omitted) (emphasis added).

(iii) "The Examiner has considered whether there might exist claims for breach of fiduciary duties in connection with shutting down the Debtor in February 2009. Ultimately, the Examiner concludes, based upon the facts derived from the examination, that **no such long-running scheme to set up a precipitous shutdown existed. Rather, the facts support the conclusion that the relevant fiduciaries struggled in good faith** for nearly 15 years to manage the business while it accumulated losses in excess of $200 million dollars." Examiner's Report p. 262 (emphasis added).

(iv) "In the end, and for the reasons discussed herein, the Examiner concludes that **no claims for breach of fiduciary duty could exist by reason of the Shutdown**." Examiner's Report p. 263 (emphasis added).

(v) "**After vigorous analysis and debate, and considered feedback from publishers**, the Debtor determined to move forward by proposing the surcharge plan." Examiner's Report p. 265 (internal footnote omitted) (emphasis added).

(vi) "Given this **strong evidence of a careful deliberative process in analyzing the merits of the proposed surcharge program**, the Examiner concludes that **no claims exist for breach of fiduciary duties** in proposing such a plan." Examiner's Report p. 270 (emphasis added).

(vii) "Given the circumstances, the members of the Management Committee **did not make an irrational or unreasonable decision**." Examiner's Report p. 271(emphasis added).

(viii) "Given these realities, the Examiner concludes that **it was within the realm of valid business judgment** for the members of the Management Committee to determine that the best way to preserve the value of the Debtor's assets was to

- 9 -

immediately and permanently shut down all of the Debtor's operations and engage in an orderly wind-up of the Debtor's affairs. Although the decision might superficially appear to be 'interested,' **the Examiner concludes there exist no claims for breach of the duty of loyalty**." Examiner's Report p. 272 (internal footnote omitted) (emphasis added).

(ix)    "Given the Examiner's conclusion that the Debtor was solvent under the Reasonable Prospect Test at all relevant times before February 1, 2009, **there exist no claims that satisfy the Report Standard for breach of fiduciary duty** for transactions occurring before that date." Examiner's Report p. 232 (emphasis added).[5]

(x)     Although the Examiner concluded that a fair process was not employed in connection with the Twin Rivers Sale that occurred on December 14, 2006, and that the price that the Debtor received was not fair, the Examiner also recognized that "there is also evidence that the fair price of Twin Rivers may have been no more than $1000, and Twin Rivers may have been of limited or even negligible value to a purchaser on the open market." Examiner's Report p. 288.[6]

(xi)    "Regardless of the Debtor's solvency situation on March 30, 2006, the Examiner concludes that no claims exist for breach of fiduciary duty in connection with the sale to Source Interlink." Examiner's Report p. 289.

16.    These excerpts are not a substitute for the Court's review of the Examiner's full analysis. For example, the Examiner explained the following in connection with the Seven Cent Charge initiative:

(i)     "Faced with a slowing economy and difficult market, as well as the need to sustain the business long-term, the Debtor continued in its efforts to boost its bottom line.  But despite those efforts, the Debtor was unable to become profitable. As the Debtor's well-known financial struggles continued, the Debtor undertook renewed efforts to implement a strategy to surcharge magazine deliveries and shift its cost of inventory." Examiner's Report pp. 56-57 (internal footnotes omitted).

(ii)    "Although the **Certain Magazine Creditors have contended that the surcharge was 'an unprecedented departure from prior industry practice[,]' the idea was not an unfamiliar concept**. Its roots can been traced to the industry's

---

[5]    "For transactions occurring prior to February 1, 2009, this section of the Report assumes, arguendo, the Debtor's insolvency for the purpose of analyzing theoretical fiduciary duty causes of action."  Examiner's Report p. 260.

[6]    Twin Rivers provided Information Technology services to Anderson News, and was created as a separate entity in connection with the entry of Anderson News and The News Group into the ProLogix joint venture as of October 28, 2005. *See* Examiner's Report p. 220-221.

consolidation in the mid-1990s, and the resulting economic inefficiencies." Examiner's Report p. 57 (internal footnotes omitted) (emphasis added).

(iii)    "Thus, the 2009 surcharge announcement was not unprecedented. Moreover, **it followed months of consideration and planning by the Debtor's officers and its Management Committee**. Various alternatives were considered, reports analyzing results were generated, and a trusted advisor and former Chief Executive Officer of Time, Don Logan, was consulted. The Debtor also modeled various pricing scenarios to gauge the effect a given surcharge rate would have on its profitability." Examiner's Report p. 59 (internal footnotes omitted) (emphasis added).

(iv)    "In connection with its surcharge announcements, the Debtor made efforts **to secure the support of its largest retailers. To that end, the Debtor solicited, and believed it had obtained, the backing of two of its largest retail customers, Walmart and Kroger**, as it embarked on this initiative. In the past, following an initiative or proposal requested by the Debtor, publishers and national distributors often contacted retailers directly to end-run around the Debtor. Locking up retailer support increased the Debtor's negotiating leverage and was an attempt to minimize the effect of any such contacts." Examiner's Report pp. 59-60 (internal footnotes omitted) (emphasis added).

(v)    "At bottom, the Debtor sought to increase its leverage, to force the hands of publishers and national distributors. Specifically, the Debtor believed that a temporary shutdown, with support from key retailers (including Walmart), would bring about publisher-acceptance of some form of a per-copy surcharge agreeable to the Debtor." Examiner's Report p. 69 (internal footnotes omitted).

17.    It is also worth noting, in this regard, that the Examiner's Report is the first time that the truth has surfaced concerning the Debtor, the Debtor's affiliates and the Magazine Creditors' actions. From their first appearance in this case and continuing through the Derivative Standing Motion, the Magazine Creditors have repeatedly accused the Debtor and its officers and managers of fraud, other misconduct, breach of fiduciary duties, the receipt of potentially "three-quarters of a billion dollars of [avoidable] transfers," and the purchase of claims to "*cover up*" any scrutiny of their conduct. Specifically, the allegations made by counsel for the Magazine Creditors were as follows: (a) "they run into opposition on trying to escape bankruptcy scrutiny"; (b) "Clearly trying to avoid any scrutiny of the Bankruptcy Court."; (c) "[acting] to prevent a trustee in bankruptcy from examining the transactions that are disclosed

- 11 -

in the schedules"; and (d) needing "to have the sunshine of a trustee who will look at this." *See,*

*e.g.* December 30, 2009 Hearing Transcript (Docket No. 204) at pages 85, 88, 94, 97, and the

March 26, 2010 Motion for the Appointment of a Trustee, Docket No. 273.

        18.    Not only has there been "scrutiny" and "sunshine," but the Examiner was

very candid about the extraordinary degree of openness and cooperation he received from

Anderson News and its affiliates. As he reported:

> Moreover, by agreement of the Examiner, the Debtor, MBHN, and on multiple
> occasions, FTI, participated in telephonic discussions and/or exchanged
> correspondence with representatives of the Debtor and/or its insiders outside the
> presence of counsel or the Examiner. Specifically, John Campbell, the Debtor's
> former Vice President of Finance, was made available to FTI – on an as-needed
> basis and without a requirement that counsel be present – to address and respond
> to inquiries made by FTI on behalf of the Examiner and his investigatory efforts.[59]
> The Examiner believes, and the results have confirmed, that the foregoing process
> not only facilitated discussions, but allowed the Examiner and his professionals to
> gain an understanding of the business operations and the cash management and
> accounting systems of the Debtor and its insiders. This greatly enhanced the
> efficiency of the investigative process.
>
> > [59] FTI corresponded primarily (towards the end of the Examiner's
> > investigation, almost daily) with Mr. Campbell given his knowledge of the
> > Debtor's financial affairs and accounting methods.

Examiner's Report p. 21.

> Indeed, the Debtor and its insiders made members of their management available to the
> Examiner and his professionals on a virtual "when and as-needed basis."

Examiner's Report p. 13.

        19.    The Examiner's Report is clear that he did not find any fraud, misconduct,

or breach of fiduciary duties on the issues raised by the Magazine Creditors. *See* paragraph 15

above; Examiner's Report at pages 56-60, 69, 224, 232, 262, 263, 265, 270, 272, 288, and 289.

        20.    To date, the Magazine Creditors have been very successful in avoiding

any inquiry into their conduct.[7] While Holston and Northshore believe that a full investigation of the Magazine Creditors' conduct is needed in the context of establishing the amount of their claims and possibly subordinating those claims, the Examiner's Report highlights the tip of the iceberg. It is time that the full truth begins to come out, and the first step in that process was the Examiner's work and Report.[8]

       21.    In contrast to the allegations made by the Magazine Creditors and others that have been found to be wholly without basis, and by way of example, without any direct discovery from the Magazine Creditors, the Examiner concluded that the Magazine Creditors

---

[7]    Of note, due to the confidential information that Kasowitz, Benson, Torres, & Freidman apparently discovered while representing Source Interlink in its action against the Magazine Creditors, the Magazine Creditors unsuccessfully sought to disqualify Debtor's counsel from representing Anderson News in the Antitrust Action. The point is, as the Magazine Creditors have said, " . . . where there's smoke, somebody ought to check out whether there's a fire." December 30, 2009 hearing transcript [Docket No. 204], page 94.

[8]    The Examiner's view of the absence of merit of the Magazine Creditors theories, allegations, and claims throughout this case is perhaps best exemplified by the analysis on pages 224 through 231 of the Examiner's Report. The telling excerpt is as follows:

> In the course of the Examiner's investigation, suggestions have been made that the Debtor's pursuit of the surcharge initiative was the culmination of a long planned and carefully timed scheme by the Debtor (and/or its owners) to exit a business in which it had lost money for a number of years.[1081] [[1081] See, e.g., Jacobsen Interview at 75:7-19 ("[T]here's no other rational conclusion you can come to.").] The hypothesis is that the Debtor would transfer as much value as possible to its insiders, cease operations, and leave non-insider creditors with nothing. The Examiner has not discovered any evidence that would support such a scheme.

> As a threshold matter, members of the Debtor's management have rejected any notion that the surcharge initiative (and timing thereof) was a ruse to jettison an otherwise unprofitable business. . . .. Those statements, of course, are self-serving as to the Debtor's intent in pursuing the surcharge initiative. ***Nevertheless, objective facts confirm that the Debtor had no plans to abruptly terminate its operations in February 2009. The following facts illustrate this point***:

*Id.* at 224-225

unilaterally changed a practice previously recognized and honored by all parties in the distribution channel (concerning the return of magazines and credits flowing therefrom without regard to the change in wholesaler) to the detriment of the Debtor and its estate.

> Compounding the Debtor's problems, national distributors notified retailers how retailer return credits would be accounted for given the Debtor's closing of its business operations. Retailers were instructed to calculate and apply return credits owed to them by the Debtor against outstanding accounts payable due to the Debtor. The effect was to deny the Debtor credit for returned magazines collected from retailers and returned to publishers by substitute wholesalers, including TNG.

> Over the decades, whether as a result of competition or otherwise, wholesaler business operations and relationships changed hands from time to time. In connection therewith, retail accounts were shifted such that the successor wholesaler assumed the retailer account and the servicing thereof. As part of the succession from one wholesaler to another, all parties in the distribution channel historically recognized and honored the return of magazines and credits flowing therefrom without regard to the change in wholesaler. They did so notwithstanding the absence of a contractual agreement to do so. In a typical case:

> The [successor wholesaler] came in with the new issues of the weeklies and the new issues of the magazines and they dropped those off and they merchandised the racks. When they merchandised the fixtures, they [took] the old stuff, they put them in their tote boxes and they took those tote boxes back to the [successor wholesaler's] facilities. They didn't push them to a corner. They didn't say Anderson News, you come pick these up. They took them to the [successor wholesaler's] facilities.

> The [successor wholesaler] scanned those returns like they did all the returns, and the [successor wholesaler] took credit against their next statement balance from the national distributors. That happened in every instance of change in [wholesaler] business from 1995 [to] any time prior to 2009.

Examiner's Report pp. 75-76 (internal footnotes omitted).

> The net effect of this method of crediting retailer returns was twofold: first, it immediately slowed down the period over which retailers would remit payments as they sorted out their net liability position with the Debtor; and second, the amount of the Debtor's accounts receivables that could ultimately be converted to cash was diminished by retailer returns. In light of the foregoing, the Debtor estimates that the impact on its cash position, over time, was approximately $87 million.

- 14 -

Examiner's Report p. 77 (internal footnote omitted).

> The Examiner has reviewed the Debtor's contentions, as well as the information provided in support thereof, and cannot conclusively determine the accuracy or reasonableness of the Debtor's estimate. Nevertheless, the Examiner agrees that the net effect of the return credit practices applied in connection with the Furlough and the Shutdown would, over a period of time, deprive the Debtor of needed cash.

Examiner's Report p. 78.

22.     Based upon these conclusions, Holston and Northshore believe that the next steps will be obtaining full discovery from the Magazine Creditors in the context of the issues in this Chapter 11 Bankruptcy Case as the actions and misconduct of the Magazine Creditors go directly to, *inter alia*, the question of solvency (independent of the claims in the Antitrust Action and the pending appeal in the Second Circuit), the allowance of their claims, and, potentially, the subordination of their claims.

23.     Thus, except for the $263,734 to $311,624 in excess interest the Examiner concluded was paid to FMC on the loans it made to the Debtor, Fiduciary Duty-based Claims are not colorable based on the Examiner's Report.   Accordingly, this Court should deny the Magazine Creditor's request for derivative standing to investigate and pursue these claims.

## III.    WHILE THE EXAMINER DETERMINED THAT COLORABLE CLAIMS EXIST WITH RESPECT TO CERTAIN AVOIDANCE ACTIONS, AUTHORIZING DERIVATIVE STANDING IS NOT APPROPRIATE AS TO THOSE CLAIMS

24.     The Magazine Creditors specifically list $66,393,872 in avoidance actions in paragraph 6 of the Derivative Standing Motion (referred to herein as the "**Identified Avoidance Actions**").

25.     With respect to the Identified Avoidance Actions, a closer analysis establishes that if pursued, significant obstacles exist to the estate obtaining any recovery or benefit, and thus a refusal to pursue is justifiable.   Further, the Debtor has not determined that

- 15 -

these actions will not be pursued, and to preserve the right to do so has sought authority to enter into a tolling agreement with the applicable parties [Docket No. 870]. Before summarizing the issues with each of the Identified Avoidance Action, Northshore and Holston submit that it is appropriate for the Court to consider as part of its determination whether the Magazine Creditors are the appropriate party to be granted derivative standing at this time.

26.     The Magazine Creditors assert that they hold approximately $149 million in claims (Derivative Standing Motion ¶ 4). However, the Debtor's bankruptcy schedules filed on March 24, 2010 [Docket No. 271] and March 31, 2011 [Docket No. 743] show the Magazine Creditors as holders of claims in the amount of $70,099,090.40 in the aggregate, prior to any offset or reduction for damages or for equitable subordination.

27.     Holston filed a proof of claim for $50,478,799.00 and the balance of its claim as filed is $23,695,320.47.[9] Northshore filed a proof of claim for $60,232,510.88. The Debtor's bankruptcy schedules show Holston has a claim totaling $23,695,320.47 and Northshore with unsecured claims totaling $58,726,773.31. Depending on what collateral is recovered by Holston for its secured claim, most or all of the $23,695,320.47 may be unsecured.

28.     Based on the Debtor's bankruptcy schedules, the balance of the total unsecured debt is $144,337,283.83. The claims register shows unsecured claims of $226,734,124.84. Accordingly, after reduction for the unsecured claims of the Magazine Creditors and Northshore, there exists **$15,511,420.10** in third-party debt based on the

---

[9]     Holston's current claim is $22,898,228.33 based on the proceeds of the Holston book foreclosure authorized by the Court after the February 2, 2010 hearing. Also, the Debtor has cash collateral from collection of accounts of $3,176,792.56 that is subject to Holston's first priority perfected lien as determined by the Examiner.

Schedules, and **$13,434,753.60** in third-party debt based on the claims register.[10]

29.    If the Debtor successfully, or unsuccessfully, objects to the Magazine Creditors' claims based on, among other things, the amounts set forth in the Debtor's Schedules, and/or if they are or are not equitably subordinated, then Holston and Northshore will have between approximately 84% and 25% of the unsecured claims in the case. This does not include the Holston DIP Loan which is currently funded in the amount of approximately $7 million and is anticipated to increase.[11]

30.    A contingency fee associated with the premature prosecution of avoidance actions makes absolutely no sense to Holston and Northshore.

31.    Moreover, because there has been no disclosure concerning the amount of the contingency fee, the terms of the proposed compensation or the connections of proposed contingency fee counsel, standing should not be granted. For the reasons explained by the Second Circuit in *In re STN Enters.*, 779 F.2d 901, 905 (2d Cir. 1985), the percentage amount of the contingency fee and all other terms should be fully disclosed and then considered in the context of the Derivative Standing Motion.

> The creditors who compose the committee may agree themselves to be responsible for all attorneys' fees, but if they would seek to impose such fees on other creditors or the chapter 11 estate, whether by contingent fee

---

[10]    The claims register indicates that Bauer Magazine LP and Bauer Publishing LP each filed duplicate claims. Specifically, the claims register reflects two identical proofs of claim filed by Bauer Magazine LP in the amounts of $5,204,424 (proofs of claim 205 and 229) and two identical proofs of claim filed by Bauer Publishing LP in the amount of $5,372,577 (proofs of claim 208 and 227). As these proofs of claim appear to be identical proofs of claims for identical amounts, the duplicate claims (proof of claim 229 for Bauer Magazine LP and proof of claim 227 for Bauer Publishing LP) have been excluded from the total amount of claims calculation.
[11]    As set forth in paragraph 25 of the Debtor's July 27, 2011 Motion to Increase the DIP Loan (Docket No. 892): "To date, all retained or appointed professionals in this case have requested $9,325,660.19 in fees ($4,132,857.49 of which is for the Examiner, and approximately $2 million of which relates to the Debtor's response to the Examiner's investigation), of which the Court has authorized $8,258,269.92 and the Debtor has paid $7,000,041.95."

arrangement or otherwise, that would obviously affect the cost-benefit analysis the court must make in determining whether to grant leave to sue. Hence fee arrangements should not only be made a matter of record but should be carefully examined by the court as it makes that determination.

*Id.*.

32.    Of equal significance is the fact that all the work has been done by the Examiner and FTI in the $4.1 million spent on the Examination. Thus, if contingency counsel is needed, the proposed contingency fee for counsel should necessarily take into account the efforts and monies expended in connection with the Examiner's examination and Report. There is simply no basis for preliminary approval of derivative authority to prosecute a claim that will inappropriately reduce the recovery to creditors.

33.    As the Examiner discusses on pages 94 to 104 of his Report, Anderson News has tried to take steps to provide, among other things, a liquidity option to its valid third party creditors for the injury caused to them from the actions of the Magazine Creditors. As the Examiner found when examining the reason behind the purchase of creditor claims:

> [Mr. Anderson, Sr.] said two things. He said take care of your folks and he said settle your debts. . . . I knew these guys. They were friends of mine. And so we said, all right, you know what? They didn't put us out of business. They were innocent bystanders. . . . . And I went up and I had personal meetings. . . . And we ended up striking a deal with them to settle our debt. And one thing led to another, and we ended up settling virtually all of our debts, except for the folks that put us out of business. But . . . that wasn't planned. We didn't understand any of this, but we understood to try to do the right thing and we did.[528]
>
> [528] Anderson Interview at 109:5-110:4.

Examiner's Report at p. 94 (internal citations omitted).

34.    Further, as noted above, without any discovery from the Magazine Creditors concerning their conduct and motivations, the Examiner concluded that Magazine

- 18 -

Creditors acted in a fashion to injure the Debtor and its creditors. The Examiner's discussion at pages 75-78, and 224-231 of the Examiner's Report is contained in paragraphs 20-22 above and is not reprinted here in the interest of brevity. While the Examiner did not adopt the analysis that "the impact on [Anderson News'] cash position, over time, was approximately $87 million", the Examiner did agree that "the net effect of the return credit practices applied in connection with the Furlough and the Shutdown would, over a period of time, deprive the Debtor of needed cash." *See* Examiner's Report pp. 77-78.

35.     Thus, the Debtor has not unjustifiably failed to pursue the colorable avoidance actions that have been identified. To the contrary, in the view of Holston and Northshore, the rush into litigation as demanded by the Magazine Creditors is unproductive and, the desire of the Magazine Creditors to do so has been part of their litigation strategy from the beginning. There is no other rational explanation for trying to derail the increase in the DIP Loan which is conditioned on the Challenge Period having expired when the Magazine Creditors wrote "It does not appear that the Examiner conducted an analysis to determine whether the liens of SunTrust Bank or the liens of Holston, as SunTrust's successor, might be subject to avoidance . . . ." knowing that this was an obviously false statement.

### i.     *First Media Capital Preference Claim*

36.     The Magazine Creditors contend that derivative standing is needed to recover $22.36 million in payments made by the Debtor to First Media Capital ("**FMC**") in respect of the Debtor's revolving line of credit with FMC (the "**FMC Revolver**") during the one-year insider preference period (the "**FMC Revolver Preference Claim**"). First, Holston and Northshore believe that the Debtor was and is solvent and that FTI's insolvency conclusions are misplaced. Second, in addition to solvency, the issue that will be addressed by a trier of fact will be whether or not the FMC Revolver was entered into in the ordinary course of business. The

- 19 -

Examiner determined that the FMC Revolver was not an ordinary course lending arrangement because, among other things: (i) the Debtor had a revolving facility with SunTrust;[12] (ii) the SunTrust facility had availability;[13] (iii) the FMC Revolver was materially more expensive because it bore interest at a slightly higher rate of Interest (ranging from $109,000 to $216,000);[14] (iv) "the FMC Revolver resulted from a likely need by the Debtor for immediate cash";[15] (v) "it appears that the FMC [Revolver] (sic) was quickly put together to provide the Debtor with needed liquidity and without meaningful deliberation";[16] (vi) "the Debtor's entry into and borrowing under the FMC Revolver violated the express terms of the SunTrust Credit Facility";[17] and (vii) incurring the FMC Revolver fell outside the Examiner's view of the "shoebox" practice of cash management.[18]

37.     While the Examiner's view obviously makes the claim at issue colorable, there are other facts that a finder of fact will consider such as (i) that the FMC Revolver was only secured by a junior lien in periodic inventory owned by the Debtor while SunTrust had a senior lien[19] and was fully collateralized by a separate/fully funded collateral account;[20] (ii) the fact that on September 30, 2008, SunTrust readily, and without any objection, approved the FMC

---

12      Examiner's Report p. 198.
13      Examiner's Report p. 198.
14      Examiner's Report p. 199-200.
15      Examiner's Report p. 199.
16      Examiner's Report p. 199.
17      Examiner's Report p. 200.
18      Examiner's Report p. 201.
19      Examiner's Report p. 181.
20      Examiner's Report p. 88 ("Anderson Media was required to fund the Borrowing Base so that at all times, it would exceed the aggregate principal amounts loaned by the Lenders"). While the Examiner's concludes that additional borrowings could have been made under the SunTrust Facility, he did not factor in the import of his acknowledgment that Anderson Media was under no obligation to continue funding the Debtor. *See* Examiner's Report pp. 272("Brookvale and Anderson Media were under no legal obligation to continue funding the Debtor.").

Revolver in the Fifth Amendment of the SunTrust Facility;[21] and (iii) the fact that the FMC Revolver was a fully documented revolving line of credit that involved six draws and 20 repayments and that was entered into more than nine months before the surprise involuntary bankruptcy filing.

38.     The point is that Holston and Northshore, while affiliated with FMC, also do not believe that the Debtor's deferral of the pursuit of the claim at issue is unjustified, assuming that the tolling agreements are approved so that the claim is protected. If the tolling agreements are not approved, then the Debtor will need to take steps to preserve the potential value of this claim before December 31, 2011, even though it will be vigorously defended.

ii.     *First Media Capital Factoring Preference Claim*

39.     The Magazine Creditors contend that derivative standing is needed to recover $14 million paid by the Debtor to FMC in respect of a factoring agreement between the Debtor and FMC within ninety days of the Petition Date (the "**FMC Factoring Preference Claim**"). As noted above, Holston and Northshore believe the Debtor was and is solvent. The issue in the case for a trier of fact will also be whether the factoring transaction was as a loan and not a sale of accounts.

40.     The Examiner concluded that recharacterization is appropriate because "FMC enjoyed virtually complete recourse against the Debtor."[22]

41.     The FMC factoring agreement provided that the Debtor would indemnify FMC if a factored account was ***subject to setoff or dispute***.[23] Because this indemnification ***did not protect against the risk of repayment*, and the risk of repayment is** the factor principally

---

21      Examiner's Report pp. 200-01.

22      Examiner's Report p. 208.

23      It should be recognized that the Wal-Mart receivables being factored were scan-based trading accounts. This means that the goods had already been sold at the *point of sale* registers and all that remained was remission of the payment for the sold inventory.

relied upon by courts that have considered whether a factoring agreement should be recharacterized, there is a substantial issue about whether the factoring will be disregarded. *See United Virginia Factors Corp. v. Aetna Casualty & Surety Co.*, 624 F.2d 814, 816 (4th Cir. 1980).

> Nor does the fact that the agreement gave Factors an express right to recover from Clients the amounts paid on the spurious invoices change the nature of these transactions. While it is true that the invoices assigned to Factors carried a warranty from the Clients that they represented bona fide existing obligations, the right of Factors to recover for a breach of such warranty was merely a contingent contractual right incident to the purchase and could not convert the transaction into a loan.

*Id.*[24]

42.     As before, the point is that Holston and Northshore, while affiliated with FMC, also do not believe that the Debtor's deferral of the pursuit of the claim at issue is unjustified, assuming that the tolling agreements are approved so that the claim is protected. If the tolling agreements are not approved, then the Debtor will need to take steps to preserve the potential value of this claim before December 31, 2011, even though it will be vigorously defended.

   iii.   *Anderson Management Services*

43.     The Magazine Creditors also seek derivative standing with respect to $8.34 million paid by the Debtor to Anderson Management Services, Inc ("**Management Services**") during the four years preceding the Petition Date in connection with and pursuant to a

---

[24]     *See also*, Klein, Susan J., *Factoring Accounts Receivable: True Sale vs. Secured Transaction*, The Secured Lender, December 2006 ("Factoring agreements contain broad representations and warranties regarding the genuineness and validity of the accounts, the lack of claims or defenses by the account debtor with respect to the underlying transaction and the bona fide nature of the accounts. *Breach of these warranties may permit recourse to the seller without changing the character of the transaction from a purchase to a loan. Requiring repurchase of accounts, if the account debtor refuses to pay based on unrelated disputes with the seller, should not result in recharacterization of the purchase of accounts*.") (emphasis added).

services agreement between the parties (the "**Management Services Fraudulent Conveyance Claim**"). As noted above, Holston and Northshore believe the Debtor was and is solvent. The issue in the case for a trier of fact will also be whether, contrary to FTI's reasoning in its separate report, an intercompany reimbursement of an expense incurred on a pass-through basis that had been passed through for years under the Management Services' contract with the Debtor is valid. FTI excluded the Debtor's obligation to reimburse Management Services for its portion of Anderson Management Services' out of pocket costs. Moreover, due to the nature and factual basis of this claim, there is no risk that faded memories or lost evidence will negatively impact the Estate. Specifically, because FTI categorically concluded that an intercompany reimbursement of an expense incurred on a pass-through basis that had been passed through for years was fraudulent if not fully supported by a paper record, and provided that this position is legally correct, the Estate will need no additional evidence to establish this claim. *See* FTI Report at pp. 84-88. Moreover, if there is risk associated with delay and the loss of evidence, Management Services would bear that risk because, based on FTI's position, Management Services will be required to establish that these payments were not fraudulent.

44. As before, the point is that Holston and Northshore, while affiliated with Management Services, also do not believe that the Debtor's deferral of the pursuit of the claim at issue is unjustified, assuming that the tolling agreements are approved so that the claim is protected. If the tolling agreements are not approved, then the Debtor will need to take steps to preserve the potential value of this claim before December 31, 2011, even though it will be vigorously defended.

iv. *MSolutions, LLC*

45. The Magazine Creditors contend that derivative standing is needed to recover $2.16 million paid by the Debtor to MSolutions, LLC ("**MSolutions**") during the four

years preceding the Petition Date (the **"MSolutions Fraudulent Conveyance Claim"**). As noted above, Holston and Northshore believe the Debtor was and is solvent. The issue in the case for a trier of fact will also be whether, contrary to FTI's reasoning in its separate report, an inter-affiliate payment can be valid if made in the ordinary course of business even if not fully supported by a paper receipt. MSolutions was and is a magazine wholesaler whose customers were not recipients of "pick, pack and ship" as were the retailers with whom Anderson News did business. From time to time Anderson News would receive a payment due to MSolutions, or would pay MSolutions for providing magazines to an Anderson News customer. It is not likely that a trier of fact will find that to be a fraudulent conveyance. Moreover, due to the nature and factual basis of this claim, there is no risk that faded memories or lost evidence will negatively impact the Estate. Specifically, because FTI categorically concluded that a transaction was fraudulent if it was not fully supported by a paper receipt, and provided that this position is legally correct, the Estate will need no additional evidence to establish this claim. *See* FTI Report at p. 149. Moreover, if there is risk associated with delay and the loss of evidence, MSolutions would bear that risk because, based on FTI's position, MSolutions will be required to establish that these payments were supported.

46. Clearly, the MSolutions claim at issue is colorable as it is identified in the Examiner's Report. As before, the point is that Holston and Northshore, while affiliated with Management Services, also do not believe that the Debtor's deferral of the pursuit of the claim at issue is unjustified, assuming that the tolling agreements are approved so that the claim is protected. If the tolling agreements are not approved, then the Debtor will need to take steps to preserve the potential value of this claim before December 31, 2011, even though it will be vigorously defended.

- 24 -

*v.* *Anderson Services, LLC*

47.    The Magazine Creditors contend that derivative standing is needed to recover $10 Million paid by the Debtor to Anderson Services, LLC ("**Anderson Services**") during the four years preceding the Petition Date (the "**Anderson Services Fraudulent Conveyance Claim**"). As this Court is aware, Anderson Services filed an assignment for the benefit of creditors in Tennessee on May 15, 2009, long before the order for relief was entered in this case. The assignment for the benefit of creditors was filed to respond to the concerns of Anderson Services' landlords that there be judicial oversight of the actions that Mr. Lloyd T. Whitaker, a third-party liquidation expert with Newleaf Corporation,[25] pursued to effect a liquidation and distribution to creditors of Anderson Services.

48.    As set forth in the motion to approve the tolling agreements and in the November 11, 2010 Stipulation Regarding Allocation of Proceeds from Anderson Service's Assignment for the Benefit of Creditors, filed to deal with the objection to the Debtor's retention of the Kellogg Huber firm in the Antitrust Action appeal (Docket No. 596), if any recovery for Brookvale as the equity interest holder of Anderson Services were to be obtained from the assignment for the benefit of creditors, it would be turned over to Anderson News for its creditors. In addition to this claim being a waste of time in trying to recover from an entity whose only material asset will be if the Assignee gets a recovery as a co-plaintiff in the Antitrust Action, because of the assignment for the benefit of creditors, Anderson Services has no assets. It is, exactly as the Magazine Creditors argue, *defunct*, because of the actions of the Magazine Creditors.

*vi.* *Brookvale Holdings, LLC*

49.    The Magazine Creditors contend that derivative standing is needed to

---

[25]    http://www.newleaf.ws/

recover each and every payment made by the Debtor to Brook Brookvale Holdings, LLC ("**Brookvale Holdings**"), totaling $1.8 million, during the four years preceding the Petition Date (the "**Brookvale Holdings Fraudulent Conveyance Claim**"). As explained above, there are material factual issues with solvency, and with FTI's view, as set forth in its separate report, that a payment is fraudulent unless there is documentation supporting each and every payment even if they are otherwise made in the ordinary course of intercompany business transactions. Moreover, due to the nature and factual basis of this claim, there is no risk that faded memories or lost evidence will negatively impact the Estate. Specifically, because FTI categorically concluded that a transaction was fraudulent if it was not fully supported by separate documentation, and provided that this position is legally correct, the Estate will need no additional evidence to establish this claim. *See* FTI Report at pp. 130-131. Moreover, if there is risk associated with delay and the loss of evidence, Brookvale Holdings would bear that risk because, based on FTI's position, Brookvale Holdings will be required to establish that these payments were supported.

      *vii.*    *Twin Rivers Technology Group, LLC*

      50.    The Magazine Creditors contend that derivative standing is needed to recover $7.66 million paid by the Debtor to Twin Rivers Technology Group, LLC ("**Twin Rivers**") during the four years preceding the Petition Date (the "**Twin Rivers Fraudulent Conveyance Claim**"). Twin Rivers provided Information Technology services to Anderson News, and was created as a separate entity in connection with the entry of Anderson News and The News Group into the ProLogix joint venture. *See* Examiner's Report p. 222. As explained above, there are material factual issues with solvency, and with FTI's view, as set forth in its separate report, that a payment is fraudulent unless there is documentation supporting each and every payment even if they are otherwise made in the ordinary course of intercompany business

- 26 -

transactions. Moreover, due to the nature and factual basis of this claim, there is no risk that faded memories or lost evidence will negatively impact the Estate. Specifically, because FTI categorically concluded that a transaction was fraudulent if it was not fully supported by documentation, and provided that this position is legally correct, the Estate will need no additional evidence to establish this claim. *See* FTI Report at p 168. Moreover, if there is risk associated with delay and the loss of evidence, Management Services would bear that risk because, based on FTI's position, MSolutions will be required to establish that these payments were supported.

51.     Accordingly, based on the contingent nature of the claims, the significant challenges that already exist, and the lack of immediate need to pursue them, the Derivative Standing Motion should be denied with respect to all avoidance actions including the Identified Avoidance Actions. The Derivative Standing Motion should also be denied due to the serious issues present with respect to the alleged unsecured claims of the Magazine Creditors and the need for a full investigation of the amounts of these claims, and the possible offsets to and equitable subordination of these claims based on the facts identified by the Examiner's Report as discussed above.

## IV.     THE REQUESTED RELIEF FAILS TO SATISFY ALL PREREQUISITES FOR DERIVATIVE STANDING

### A.  *Applicable Standard for Derivative Standing*

52.     A party seeking derivative standing to pursue claims on behalf of the Debtor has the burden of showing the following: "(1) a colorable claim, (2) that [the Debtor] unjustifiably refused to pursue the claim (3) the permission of the bankruptcy court to initiate the action." *Infinity Investors Ltd. v. Kingborough (In re Yes! Entm't Corp.)*, 316 B.R. 141, 145 (D. Del. 2004); *see also Cybergenics*, 330 F.3d at 568; *In re G-I Holdings, Inc.*, 313 B.R. 612, 628

- 27 -

(Bankr. D.N.J. 2004); *In re Valley Media, Inc.*, 2003 WL 21956410, *2 (Bankr. D. Del. Aug. 14, 2003).

53.     To establish their right to derivative standing, the Magazine Creditors must first establish that a colorable claim exists. *In re G-I Holdings*, 313 B.R. at 629. Whether such a claim exists is determined under the same standard used to decide a motion to dismiss under Federal Rule of Civil Procedures ("**Federal Rule(s)**") Rule 12(b)(6) for failure to state a claim. *Id.* at 631. To determine whether a colorable claim exists, the Court must determine (i) whether the alleged facts, taken as true, state a claim for relief, including consideration of any reasonable inferences derived from the alleged facts <u>and</u> (ii) whether an affirmative defense exists based on the alleged facts. *Id.* The Court may also consider documents attached or incorporated by reference in a complaint and also public records. *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994)

54.     In this case the Court has the clear benefit of the Examiner's Report that is the basis for the Derivative Standing Motion even though, as explained above, it does not support the request for derivative standing. To the contrary, the Examiner's Report makes clear that the most of what the Magazine Creditors argue is actually contrary to the Examiner's determinations and only the Identified Avoidance Actions were colorable claims.

55.     In evaluating a request for derivative standing, affirmative defenses can be considered. *In re GI-Holdings* reasoned that "the court also examines the facts as alleged by the plaintiff for any dispositive affirmative defenses." 313 B.R. at 631. The *GI-Holdings* court determined that this was appropriate because the claim could lack merit after consideration of affirmative defenses and would then "neither be in the best interest of the estate nor necessary and beneficial to the efficient resolution of the bankruptcy proceedings." *Id.*

- 28 -

56.     If the Magazine Creditors can establish that a colorable claim exists, and such claim is not subject to a valid affirmative defense, this is not the end of the inquiry. The Magazine Creditors must then show that the Debtor unjustifiably refused to pursue the claim. *Id.* at 629. To establish that the Debtor unjustifiably refused to pursue a colorable claim, the Magazine Creditors must show by "affidavit and other submission, by evidentiary hearing or otherwise" that there is "a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce." *Id.* at 629 (citing *Unsecured Creditors Comm. of STN Enters., Inc. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 905-06 (2d Cir. 1985)). Like the court's consideration of affirmative defenses in *In re GI Holdings*, courts have undertaken a cost-benefit analysis after a finding of a colorable claim to determine whether estate time and resources should be spent on a claim, even if colorable.

57.     In sum, the Magazine Creditors must show that (i) there is a colorable claim (that is not subject to affirmative defense) and (ii) pursuing the claim would, through a cost-benefit-analysis, likely benefit the Debtor's creditors. Then, only after the Magazine Creditors satisfy their burden, does the burden shift to the Debtor to show, by a preponderance of evidence, that its decision not to pursue the claim was justified. *Id.; In re Yes! Entm't*, 316 B.R. at 145 ("It is the creditor's burden in the first instance to demonstrate that it has satisfied these prerequisites for derivative standing.").

58.     This burden is important because the Magazine Creditors focus a considerable portion of the Derivative Standing Motion on the Debtor's alleged conflicts of interests. They assert that these conflicts are sufficient to show that the Debtor unjustifiably refused to pursue the Derivative Claims even though the other legal requirements for derivative

standing are not met. Derivative Standing Motion ¶ 51-56. This is a misstatement of the applicable law.

59. First, the conflict of interest argument completely ignores the required analysis for derivative standing. The Magazine Creditors have the burden to prove that a colorable claim exists. *In re GI-Holdings,* 313 B.R. at 631. After, and only after, a party establishes the existence of colorable claims does the burden shift to the Debtor to show a justified reason for not pursuing the claim. *Id.* As stated above, the Magazine Creditors have not even identified the claims that they allege exist let alone the facts to support those claims.

60. Second, as explained above in paragraphs 15 to 20, Anderson News and its affiliates have been subject to $4.1 million of scrutiny by the Examiner for fourteen months. The results showed that this Debtor, and those that are connected to it, have acted with appropriate business diligence and have not engaged in any fraud or misconduct of any kind. Further, as also explained above in paragraphs 36 to 50, the avoidance claims that have been identified by the Examiner as being "colorable" are still subject to substantial defenses.

61. Third, because of the relative claim amounts and the almost certainty, based on the Examiner's Report, that there will be investigation of and likely objections to and requests for equitable subordination of the claims of the Magazine Creditors, allowing the Magazine Creditors to act as an estate representative is not appropriate. *See* the discussion in paragraphs 20-22 and 34 above.

62. Additionally, the Magazine Creditors also request relief beyond that allowed under derivative standing. They have not sought authority to pursue specific "colorable" claims. Instead, the Magazine Creditors seek authority to conduct a further investigation and later, in their sole discretion, to pursue whatever claims they believe have merit. *See* Derivative

Standing Motion ¶ 50 ("If the Court grants derivative standing to Magazine Creditors to prosecute the Avoidance Action Claims, then for the sake of efficiency *Magazine Creditors should also have the authorization to prosecute all Derivative Claims, to the extent that their investigation determines that any of them have merit*.") (emphasis added). Such an extremely overbroad grant of authority is beyond what the law allows, particularly where, as here, an Examination has been completed and a public Report filed.

## V.    CONCLUSION

63.    In conclusion, it is clear that the Magazine Creditors have not met their burden to obtain derivative standing, or, moreover, justified their extraordinary request to (i) conduct an unfettered re-investigation of all issues already investigated in this case and (ii) pursue claims without specific permission from this Court. This request should be denied under applicable law and, as a simple matter, based on what has been established by the Examiner thus far in this case. A year long $4.1 million dollar investigation shows that the conduct of the movants here, instead of the Debtor's officers and directors, may well be what pushed the Debtor into bankruptcy and injured the company and the recovery for creditors. To grant these same parties free rein to pursue claims of the Debtor is exactly what a court of equity should not do, and the request of the Magazine Creditors for such authority after all of the contrary evidence and facts determined by the Examiner and otherwise part of the record in this case speaks loudly and clearly to the true and improper intent of the Magazine Creditors to use this case as a

litigation strategy to try to avoid ever themselves being subject to "scrutiny" and "sunshine."

Respectfully submitted this 10th day of August 2011.

KLEHR HARRISON HARVEY
BRANZBURG LLP

_____/s/ Domenic E. Pacitti_____
Domenic E. Pacitti (DE Bar No. 3989)
919 Market Street, Suite 1000
Wilmington, DE 19801
Telephone: (302) 426-1189
Facsimile: (302) 426-9193
dpacitti@klehr.com

Morton R. Branzburg
1835 Market Street, Suite 1400
Philadelphia, PA 19103
Telephone: (215) 568-6060
Facsimile: (215) 568-6603
mbranzburg@klehr.com

and

ALSTON & BIRD LLP
Grant T. Stein
David A. Wender
1201 West Peachtree Street
Atlanta, Georgia, 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777

*Counsel to Holston Asset Management, LLC and Northshore Capital, LLC*